(Slip Opinion) OCTOBER TERM, 2009 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BERGHUIS, WARDEN *v.* SMITH

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 08–1402.   Argued January 20, 2010—Decided March 30, 2010

Criminal defendants have a Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community. See *Taylor* v. *Louisiana*, 419 U. S. 522. To establish a prima facie violation of the fair-cross-section requirement, a defendant must prove that: (1) a group qualifying as "distinctive" (2) is not fairly and reasonably represented in jury venires, and (3) "systematic exclusion" in the jury-selection process accounts for the underrepresentation. *Duren* v. *Missouri*, 439 U. S. 357, 364.

At *voir dire* in the Kent County Circuit Court trial of respondent Smith, an African-American, the venire panel included between 60 and 100 individuals, only 3 of whom, at most, were African-American. At that time, African-Americans constituted 7.28% of the County's jury-eligible population, and 6% of the pool from which potential jurors were drawn. The court rejected Smith's objection to the panel's racial composition, an all-white jury convicted him of second-degree murder and felony firearm possession, and the court sentenced him to life in prison with the possibility of parole.

On order of the Michigan Court of Appeals, the trial court conducted an evidentiary hearing on Smith's fair-cross-section claim. The evidence at the hearing showed, *inter alia,* that under the juror-assignment order in effect when Smith's jury was empaneled, the County assigned prospective jurors first to local district courts, and, only after filling local needs, made remaining persons available to the countywide Circuit Court, which heard felony cases like Smith's. Smith calls this procedure "siphoning." The month after Smith's *voir dire*, however, the County reversed course and adopted a Circuit-Court-first assignment order. It did so based on the belief that the district courts took most of the minority jurors, leaving the Circuit

Court with a jury pool that did not represent the entire County. The trial court noted two means of measuring the underrepresentation of African-Americans on Circuit Court venires. First, the court described the "absolute disparity" test, under which the percentage of African-Americans in the jury pool (6%) is subtracted from the percentage of African-Americans in the local, jury-eligible population (7.28%). According to this measure, African-Americans were underrepresented by 1.28%. Next, the court set out the "comparative disparity" test, under which the absolute disparity (1.28%) is divided by the percentage of African-Americans in the jury-eligible population (7.28%). The quotient (18%) indicated that, on average, African-Americans were 18% less likely, when compared to the overall jury-eligible population, to be on the jury-service list. In the 11 months after Kent County discontinued the district-court-first assignment policy, the comparative disparity, on average, dropped from 18% to 15.1%. The hearing convinced the trial court that African-Americans were underrepresented on Circuit Court venires. But Smith's evidence, the trial court held, was insufficient to prove that the juror-assignment order, or any other part of the jury-selection process, had systematically excluded African-Americans. The court therefore rejected Smith's fair-cross-section claim.

The state intermediate appellate court reversed and ordered a new trial with jurors selected under the Circuit-Court-first assignment order. Reversing in turn, the Michigan Supreme Court concluded that Smith had not established a prima facie Sixth Amendment violation. This Court, the state High Court observed, has specified no preferred method for measuring whether representation of a distinctive group in the jury pool is fair and reasonable. The court noted that lower federal courts had applied three tests: the absolute and comparative disparity tests and a standard deviation test. Adopting a case-by-case approach allowing consideration of all three means of measuring underrepresentation, the court found that Smith had failed to establish a legally significant disparity under any measurement. Nevertheless giving Smith the benefit of the doubt on underrepresentation, the court determined that he had not shown systematic exclusion.

Smith then filed a federal habeas petition. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) prohibits federal habeas relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U. S. C. §2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"

§2254(d)(2). Finding no infirmity in the Michigan Supreme Court's decision when assessed under AEDPA's standards, the District Court dismissed Smith's petition. The Sixth Circuit reversed. The Court of Appeals ruled, first, that courts should use the comparative disparity test to measure underrepresentation where, as here, the allegedly excluded group is small. The court then held that Smith's comparative disparity statistics demonstrated that African-Americans' representation in County Circuit Court venires was unfair and unreasonable. It next stated that Smith had shown systematic exclusion. In accord with the Michigan intermediate appellate court, the Sixth Circuit believed that the district-court-first assignment order significantly reduced the number of African-Americans available for Circuit Court venires. Smith was entitled to relief, the Sixth Circuit concluded, because no important state interest supported the district-court-first allocation system.

*Held:* The Sixth Circuit erred in ruling that the Michigan Supreme Court's decision "involv[ed] an unreasonable application o[f] clearly established Federal law," §2254(d)(1). *Duren* hardly establishes—no less "clearly" so—that Smith was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community. Pp. 10–16.

(a) The *Duren* defendant readily met all three parts of the Court's prima facie test when he complained of the dearth of women in a county's jury pool. First, he showed that women in the county were both "numerous and distinct from men." 439 U. S., at 364. Second, to establish underrepresentation, he proved that women were 54% of the jury-eligible population, but accounted for only 26.7% of those summoned for jury service, and only 14.5% of those on the postsummons weekly venires from which jurors were drawn. *Id.,* at 364–366. Finally, to show the "systematic" cause of the underrepresentation, he pointed to Missouri's law permitting any woman to opt out of jury service and to the manner in which the county administered that law. This Court noted that "appropriately tailored" hardship exemptions would likely survive a fair-cross-section challenge if justified by an important state interest, *id.,* at 370, but concluded that no such interest could justify the exemption for each and every woman, *id.,* at 369–370. Pp. 10–11.

(b) Neither *Duren* nor any other decision of this Court specifies the method or test courts must use to measure underrepresentation. Each of the three methods employed or identified by the courts below—absolute disparity, comparative disparity, and standard deviation—is imperfect. Absolute disparity and comparative disparity measurements can be misleading where, as here, members of the distinctive group compose only a small percentage of the community's

jury-eligible population. And it appears that no court has relied exclusively on a standard deviation analysis. Even absent AEDPA's constraint, this Court would have no cause to take sides here on the appropriate method or methods for measuring underrepresentation. Although the Michigan Supreme Court concluded that Smith's statistical evidence failed to establish a legally significant disparity under either the absolute or comparative disparity tests, the court nevertheless gave Smith the benefit of the doubt on underrepresentation in order to reach the issue ultimately dispositive in *Duren*: To the extent underrepresentation existed, was it due to "systematic exclusion"? See *Duren*, 439 U. S., at 364. Pp. 11–13.

(c) Smith's evidence gave the Michigan Supreme Court little reason to conclude that the district-court-first assignment order had any significant effect on the representation of African-Americans on Circuit Court venires. Although the record established that some County officials *believed* that the assignment order created racial disparities, and the County reversed the order in response, the belief was not substantiated by Smith's evidence. He introduced no evidence that African-Americans were underrepresented on the Circuit Court's venires in significantly higher percentages than on the District Court for Grand Rapids, which had the County's largest African-American population. He did not address whether Grand Rapids had more need for jurors per capita than any other district in Kent County. And he did not compare the African-American representation levels on Circuit Court venires with those on the Federal District Court venires for the same region. See *Duren*, 439 U. S., at 367, n. 25. Smith's best evidence of systematic exclusion was the decline in comparative underrepresentation, from 18 to 15.1%, after Kent County reversed its assignment order. But that evidence indicated no large change and was, in any event, insufficient to prove that the original assignment order had a significantly adverse impact on the representation of African-Americans on Circuit Court venires. Pp. 13–14.

(d) In addition to renewing his "siphoning" argument, Smith urges that a laundry list of factors—*e.g.,* the County's practice of excusing prospective jurors without adequate proof of alleged hardship, and the refusal of County police to enforce orders for prospective jurors to appear—combined to reduce systematically the number of African-Americans appearing on jury lists. No "clearly established" precedent of this Court supports Smith's claim. Smith urges that one sentence in *Duren,* 439 U. S., at 368–369, places the burden of proving causation on the State. But Smith clipped that sentence from its context: The sentence does not concern the demonstration of a prima face case; instead, it speaks to what the State might show *to rebut* the de-

Syllabus

fendant's prima facie case. The Michigan Supreme Court was therefore far from "unreasonable," §2254(d)(1), in concluding that *Duren* first and foremost required Smith himself to show that the underrepresentation complained of was due to systematic exclusion. This Court, furthermore, has never "clearly established" that jury-selection-process features of the kind on Smith's list can give rise to a fair-cross-section claim. Rather, the *Taylor* Court "recognized broad discretion in the States" to "prescribe relevant qualifications for their jurors and to provide reasonable exemptions." 419 U. S., at 537–538. And in *Duren*, the Court understood that hardship exemptions resembling those Smith assails might well "survive a fair-cross-section challenge." 439 U. S., at 370. Pp. 14–16.

543 F. 3d 326, reversed and remanded.

GINSBURG, J., delivered the opinion for a unanimous Court. THOMAS, J., filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–1402

———————

## MARY BERGHUIS, WARDEN, PETITIONER *v.* DIAPOLIS SMITH

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[March 30, 2010]

JUSTICE GINSBURG delivered the opinion of the Court.

The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community. See *Taylor* v. *Louisiana*, 419 U. S. 522 (1975). The question presented in this case is whether that right was accorded to respondent Diapolis Smith, an African-American convicted of second-degree murder by an all-white jury in Kent County, Michigan in 1993. At the time of Smith's trial, African-Americans constituted 7.28% of Kent County's jury-eligible population, and 6% of the pool from which potential jurors were drawn.

In *Duren* v. *Missouri*, 439 U. S. 357 (1979), this Court described three showings a criminal defendant must make to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement. He or she must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-

representation is due to systematic exclusion of the group in the jury-selection process." *Id.,* at 364. The first showing is, in most cases, easily made; the second and third are more likely to generate controversy.

The defendant in *Duren* readily met all three measures. He complained of the dearth of women in the Jackson County, Missouri, jury pool. To establish underrepresentation, he proved that women were 54% of the jury-eligible population, but accounted for only 26.7% of the persons summoned for jury service, and only 14.5% of the persons on the postsummons weekly venires from which jurors were drawn. To show the "systematic" cause of the underrepresentation, Duren pointed to Missouri's law exempting women from jury service, and to the manner in which Jackson County administered the exemption. Concluding that no significant state interest could justify Missouri's explicitly gender-based exemption, this Court held the law, as implemented in Jackson County, violative of the Sixth Amendment's fair-cross-section requirement.

We here review the decision of the United States Court of Appeals for the Sixth Circuit holding that Smith "satisf[ied] the prima facie test established by *Duren*," and granting him habeas corpus relief, *i.e.,* release from imprisonment absent a new trial commenced within 180 days of the Court of Appeals' order. 543 F. 3d 326, 336 (2008). Despite marked differences between Smith's case and Duren's, and a cogent Michigan Supreme Court decision holding that Smith "ha[d] not shown . . . systematic exclusion," *People* v. *Smith*, 463 Mich. 199, 205, 615 N. W. 2d 1, 3 (2000), the Sixth Circuit found the matter settled. Cognizant of the restrictions Congress placed on federal habeas review of state-court convictions, the Court of Appeals considered that a decision contrary to its own would "involv[e] an unreasonable application o[f] clearly established Federal law, as determined by the Supreme Court of the United States," 28 U. S. C. §2254(d)(1). 543 F. 3d,

at 335.

The Sixth Circuit erred in so ruling. No decision of this Court "clearly establishe[s]" Smith's entitlement to federal-court relief. According to the Sixth Circuit, Smith had demonstrated that a Kent County prospective-juror-assignment procedure, which Smith calls "siphoning," "systematic[ally] exclu[ded]" African-Americans. Under this procedure, Kent County assigned prospective jurors first to local district courts, and, only after filling local needs, made remaining persons available to the county-wide Circuit Court, which heard felony cases like Smith's. The Michigan Supreme Court, however, had rejected Smith's "siphoning" plea for lack of proof that the assignment procedure caused underrepresentation. *Smith*, 463 Mich., at 205, 615 N. W. 2d, at 3. As that determination was not at all unreasonable, the Sixth Circuit had no warrant to disturb it. See §2254(d)(2).

In addition to renewal of his "siphoning" argument, Smith here urges that a host of factors combined to reduce systematically the number of African-Americans appearing on Kent County jury lists, for example, the Kent County court's practice of excusing people without adequate proof of alleged hardship, and the refusal of Kent County police to enforce orders for prospective jurors to appear. Brief for Respondent 53–54. Our decisions do not address factors of the kind Smith urges. We have cautioned, however, that "[t]he fair-cross-section principle must have much leeway in application." *Taylor*, 419 U. S., at 537–538; see *id.,* at 537 (Court's holding that Sixth Amendment is violated by systematic exclusion of women from jury service "does not augur or authorize the fashioning of detailed jury-selection codes by federal courts.").

I

A

On November 7, 1991, Christopher Rumbley was shot

and killed during a bar brawl in Grand Rapids, Michigan. The bar was crowded at the time of the brawl, with 200-to-300 people on the premises. All patrons of the bar were African-American. The State charged Smith with the murder in Kent County Circuit Court.

*Voir dire* for Smith's trial took place in September 1993. The venire panel included between 60 and 100 individuals. The parties agree that, at most, three venire members were African-American. Smith unsuccessfully objected to the composition of the venire panel.

Smith's case proceeded to trial before an all-white jury. The case for the prosecution turned on the identity of the man who shot Rumbley. Thirty-seven witnesses from the bar, including Smith, testified at the trial. Of those, two testified that Smith fired the gun. Five testified that the shooter was not Smith, and the remainder made no identifications of the shooter. The jury convicted Smith of second-degree murder and possession of a firearm during a felony, and the court sentenced him to life imprisonment with the possibility of parole.

B

On first appeal, the Michigan Court of Appeals ordered the trial court to conduct an evidentiary hearing on Smith's fair-cross-section claim. The hearing occurred in early 1998. Smith's evidence showed that Grand Rapids, the largest city in Kent County, was home to roughly 37% of Kent County's population, and to 85% of its African-American residents. Felony charges in Kent County were tried in a sole Circuit Court. Misdemeanors were prosecuted in 12 district courts, each covering a discrete geographical area. To fill the courts' venires, Kent County sent questionnaires to prospective jurors. The Circuit Court Administrator testified that about 5% of the forms were returned as undeliverable, and another 15 to 20% were not answered. App. 13a. From the pool of prospec-

tive jurors who completed questionnaires, the County granted requests for hardship exemptions, *e.g.,* for lack of transportation or child care. *Id.,* at 21a. Kent County then assigned nonexempt prospective jurors to their local district courts' venires. After filling the district courts' needs, the County assigned the remaining prospective jurors to the Circuit Court's panels. *Id.,* at 20a, 22a.

The month after *voir dire* for Smith's trial, Kent County reversed the assignment order. It did so, according to the Circuit Court Administrator, based on "[t]he belief . . . that the respective districts essentially swallowed up most of the minority jurors," leaving the Circuit Court with a jury pool that "did not represent the entire county." *Id.,* at 22a. The Jury Minority Representation Committee, its co-chair testified, held the same view concerning the impact of choosing district court jurors first and not returning unused persons to the pool available for Circuit Court selections. *Id.,* at 64a–65a.

The trial court considered two means of measuring the extent of underrepresentation of African-Americans on Circuit Court venires: "absolute disparity" and "comparative disparity." "Absolute disparity" is determined by subtracting the percentage of African-Americans in the jury pool (here, 6% in the six months leading up to Smith's trial) from the percentage of African-Americans in the local, jury-eligible population (here, 7.28%). By an absolute disparity measure, therefore, African-Americans were underrepresented by 1.28%. "Comparative disparity" is determined by dividing the absolute disparity (here, 1.28%) by the group's representation in the jury-eligible population (here, 7.28%). The quotient (here, 18%), showed that, in the six months prior to Smith's trial, African-Americans were, on average, 18% less likely, when compared to the overall jury-eligible population, to be on the jury-service list. App. to Pet. for Cert. 215a.

Isolating the month Smith's jury was selected, Smith's

statistics expert estimated that the comparative disparity
was 34.8%.  App. 181a.  In the 11 months after Kent
County discontinued the district-court-first assignment
policy, the comparative disparity, on average, dropped
from 18% to 15.1%.  *Id.,* at 102a–103a, 113a.

Smith also introduced the testimony of an expert in
demographics and economics, who tied the underrepresen-
tation to social and economic factors.  In Kent County, the
expert explained, these forces made African-Americans
less likely than whites to receive or return juror-eligibility
questionnaires, and more likely to assert a hardship ex-
cuse.  *Id.,* at 79a–80a.

The hearing convinced the trial court that African-
Americans were underrepresented in Circuit Court veni-
res.  App. to Pet. for Cert. 210a.  But Smith's evidence was
insufficient, that court held, to prove that the juror-
assignment order, or any other part of the jury-selection
process, had systematically excluded African-Americans.
*Id.,* at 210a–212a.  The court therefore rejected Smith's
fair-cross-section claim.

## C

The Michigan Court of Appeals concluded that the juror-
allocation system in place at the relevant time did result
in the underrepresentation of African-Americans.  *Id.,* at
182a–183a.  Reversing the trial court's judgment, the
intermediate appellate court ordered a new trial, with
jurors selected under the Circuit-Court-first assignment
order installed shortly after the *voir dire* in Smith's case.
*Ibid.*; see *supra,* at 5.

The Michigan Supreme Court, in turn, reversed the
Court of Appeals' judgment, concluding that Smith "ha[d]
not established a prima facie violation of the Sixth
Amendment fair-cross-section requirement."  *Smith*, 463
Mich., at 207, 615 N. W. 2d, at 4.  The Michigan High
Court observed, first, that this Court has specified "[no]

preferred method for measuring whether representation of a distinctive group in the jury pool is fair and reasonable." *Id.,* at 203, 615 N. W. 2d, at 2. The court then noted that lower federal courts had applied three different methods to measure fair and reasonable representation: the absolute and comparative disparity tests, described *supra,* at 5, and "the standard deviation test."[1]

Recognizing that no single test was entirely satisfactory, the Michigan Supreme Court adopted a case-by-case approach allowing consideration of all three means of measuring underrepresentation. *Smith*, 463 Mich., at 204, 615 N. W. 2d, at 3. Smith's statistical evidence, the court found, "failed to establish a legally significant disparity under either the absolute or comparative disparity tests." *Id.,* at 204–205, 615 N. W. 2d, at 3. (The parties had presented no expert testimony regarding application of the standard deviation test. *Id.,* at 204, n. 1, 615 N. W. 2d, at 3, n. 1; *supra,* at 5–6.)

Nevertheless "grant[ing] [Smith] the benefit of the doubt on unfair and unreasonable underrepresentation," the Michigan Supreme Court ultimately determined that "he ha[d] not shown systematic exclusion." *Smith*, 463 Mich., at 203, 205, 615 N. W. 2d, at 2, 3. Smith's evidence, the court said, did not show "how the alleged siphoning of African American jurors to district courts affected the circuit court jury pool." *Id.,* at 205, 615 N. W. 2d, at 3. In particular, the court observed, "[t]he record does not disclose whether the district court jury pools contained more, fewer, or approximately the same percentage of minority jurors as the circuit court jury pool." *Ibid.* The court also ruled that "the influence of social and economic factors on

--------------

[1] Standard deviation analysis seeks to determine the probability that the disparity between a group's jury-eligible population and the group's percentage in the qualified jury pool is attributable to random chance. See *People* v. *Smith,* 463 Mich. 199, 219–220, 615 N. W. 2d 1, 9–10 (2000) (Cavanagh, J., concurring).

juror participation does not demonstrate a systematic exclusion." *Id.,* at 206, 615 N. W. 2d, at 3.

## D

In February 2003, Smith filed a habeas corpus petition in the United States District Court for the Western District of Michigan, reasserting his fair-cross-section claim. Because Smith is "in custody pursuant to the judgment of a State court," the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), §2254, governed the District Court's review of his application for federal habeas corpus relief. Under the controlling provision of AEDPA, codified in §2254(d), a state prisoner's application may not be granted as to "any claim . . . adjudicated . . . in State court" unless the state court's adjudication

> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Applying these standards, the District Court dismissed Smith's habeas petition. App. to Pet. for Cert. 40a–42a.

The Court of Appeals reversed. Where, as here, the allegedly excluded group is small, the Sixth Circuit ruled, courts should use the comparative disparity test to measure underrepresentation. 543 F. 3d, at 338. In that court's view, Smith's comparative disparity statistics sufficed "to demonstrate that the representation of African American veniremen in Kent County . . . was unfair and unreasonable." *Ibid.* As to systematic exclusion, the Sixth Circuit, in accord with the Michigan intermediate appellate court, believed that the juror-assignment order in effect when Smith's jury was empaneled significantly

reduced the number of African-Americans available for Circuit Court venires. *Id.,* at 342. Smith was entitled to relief, the court concluded, because no important state interest supported that allocation system. *Id.,* at 345.[2]

The State petitioned for certiorari attacking the Sixth Circuit's decision on two principal grounds: First, the State charged that the federal appellate court erred in adopting the comparative disparity test to determine whether a distinctive group was underrepresented in the jury pool. Pet. for Cert. ii. Second, the State urged that, in any event, "there was no . . . systematic exclusion of African Americans from juries in Kent County, Michigan," *id.,* at 25, and no warrant for the Sixth Circuit's contrary determination.[3] We granted review, 557 U. S. ____ (2009), and now reverse the Sixth Circuit's judgment.

According to the Sixth Circuit, the Michigan Supreme Court's rejection of Smith's Sixth Amendment plea "involved an unreasonable application o[f] clearly established Federal law, as determined by [this Court in *Duren*]."

————————

[2] The Sixth Circuit also found that the Michigan Supreme Court had unreasonably applied *Duren* v. *Missouri,* 439 U. S. 357 (1979), when it declared that social and economic factors could not establish systematic exclusion. 543 F. 3d, at 341–342. Because such factors disproportionately affect African-Americans, the Sixth Circuit said, Kent County's routine grants of certain hardship exemptions "produced systematic exclusion within the meaning of *Duren.*" *Ibid.* The Sixth Circuit held, however, that the hardship exemptions could not establish a fair-cross-section claim because the State "has a significant interest [in] avoiding undue burdens on individuals" by allowing such excuses. *Id.,* at 345.

[3] Although the question presented by the State homes in on the proper measure for underrepresentation, it initially and more comprehensively inquires whether Smith was denied his right to a jury drawn from a fair cross section of the community. See Pet. for Cert. ii (asking "[w]hether the U. S. Court of Appeals for the Sixth Circuit erred in concluding that the Michigan Supreme Court failed to apply 'clearly established' Supreme Court precedent under 28 U. S. C. §2254 on the issue of the fair cross-section requirement under *Duren* . . . ."). We therefore address that overarching issue.

§2254(d)(1); see 543 F. 3d, at 345. We disagree. As explained below, our *Duren* decision hardly establishes—no less "clearly" so—that Smith was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community.

## II

To establish a prima facie violation of the fair-cross-section requirement, this Court's pathmarking decision in *Duren* instructs, a defendant must prove that: (1) a group qualifying as "distinctive" (2) is not fairly and reasonably represented in jury venires, and (3) "systematic exclusion" in the jury-selection process accounts for the underrepresentation. 439 U. S., at 364; see *supra,* at 1–2.

The defendant in *Duren* successfully challenged Jackson County's administration of a Missouri exemption permitting any woman to opt out of jury service. 439 U. S., at 360. The Court explained why it was plain that defendant Duren had established a prima facie case. First, women in Jackson County were both "numerous and distinct from men." *Id.,* at 364 (quoting *Taylor*, 419 U. S., at 531). Second, Duren's "statistical presentation" showed gross underrepresentation: Women were over half the jury-eligible population; in stark contrast, they accounted for less than 15% of jury venires. 439 U. S.*,* at 364–366.

Duren also demonstrated systematic exclusion with particularity. He proved that women's underrepresentation was persistent—occurring in every weekly venire for almost a year—and he identified the two stages of the jury-selection process "when . . . the systematic exclusion took place." *Id.,* at 366. First, questionnaires for prospective jurors stated conspicuously that women could opt out of jury service. Less than 30% of those summoned were female, suggesting that women in large numbers claimed the exemption at the questionnaire stage. *Ibid.* "Moreover, at the summons stage women were . . . given another

opportunity to [opt out]." *Id.,* at 366–367. And if a woman ignored the summons, she was deemed to have opted out; no further inquiry was made. *Id.,* at 367. At this "final, venire, stage," women's representation plummeted to 14.5%. *Ibid.* In the Federal District Court serving the same territory, the Court noted, despite a women-only childcare exemption, women accounted for nearly 40% of those actually serving on juries. See *ibid.*, n. 25.

The "disproportionate and consistent exclusion of women from the [Jackson County] jury wheel and at the venire stage," the Court concluded, "was quite obviously due to the *system* by which juries were selected." *Id.,* at 367. "[A]ppropriately tailored" hardship exemptions, the Court added, would likely survive a fair-cross-section challenge if justified by an important state interest. *Id.,* at 370. But no such interest, the Court held, could justify Missouri's exemption for each and every woman—the altogether evident explanation for the underrepresentation. *Id.,* at 369–370.

### III
### A

As the Michigan Supreme Court correctly observed, see *supra,* at 6, neither *Duren* nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools. The courts below and the parties noted three methods employed or identified in lower federal court decisions: absolute disparity, comparative disparity, and standard deviation. See *Smith*, 463 Mich., at 204–205, 615 N. W. 2d, at 2–3; Brief for Petitioner 3; Brief for Respondent 26; *supra,* at 6–7.

Each test is imperfect. Absolute disparity and comparative disparity measurements, courts have recognized, can be misleading when, as here, "members of the distinctive group comp[ose] [only] a small percentage of those eligible

for jury service." *Smith*, 463 Mich., at 203–204, 615 N. W. 2d, at 2–3. And to our knowledge, "[n]o court . . . has accepted [a standard deviation analysis] alone as determinative in Sixth Amendment challenges to jury selection systems." *United States* v. *Rioux*, 97 F. 3d 648, 655 (CA2 1996).

On direct review, as earlier stated, the Michigan Supreme Court chose no single method "to measur[e] whether representation was fair and reasonable." *Smith*, 463 Mich., at 204, 615 N. W. 2d, at 3; see *supra,* at 7. Instead, it "adopt[ed] a case-by-case approach." *Smith*, 463 Mich., at 204, 615 N. W. 2d, at 3. "Provided that the parties proffer sufficient evidence," that court said, "the results of all of the tests [should be considered]." *Ibid.* In contrast, the Sixth Circuit declared that "[w]here the distinctive group alleged to have been underrepresented is small, as is the case here, the comparative disparity test is the more appropriate measure of underrepresentation." 543 F. 3d, at 338.

Even in the absence of AEDPA's constraint, see *supra*, at 8, we would have no cause to take sides today on the method or methods by which underrepresentation is appropriately measured.[4] Although the Michigan Supreme Court concluded that "[Smith's] statistical evidence failed to establish a legally significant disparity under either the absolute or comparative disparity tests," *Smith*, 463 Mich., at 204–205, 615 N. W. 2d, at 3,[5] that court nevertheless

———————

[4] The State asks us to "adopt the absolute-disparity standard for measuring fair and reasonable representation" and to "requir[e] proof that the absolute disparity exceeds 10%" to make out a prima facie fair-cross-section violation. Brief for Petitioner 45–46. Under the rule the State proposes, "the Sixth Amendment offers no remedy for complete exclusion of distinct groups in communities where the population of the distinct group falls below the 10 percent threshold." Brief for Respondent 35. We need not reach that issue.

[5] For similar conclusions, see, for example, *United States* v. *Orange*, 447 F. 3d 792, 798–799, and n. 7 (CA10 2006) (absolute disparity of

gave Smith "the benefit of the doubt on underrepresenta-
tion," *id.,* at 205, 615 N. W. 2d, at 3. It did so in order to
reach the issue ultimately dispositive in *Duren*: To the
extent underrepresentation existed, was it due to "system-
atic exclusion"? *Ibid.*; see *Duren*, 439 U. S., at 364.

### B

Addressing the ground on which the Sixth Circuit rested
its decision, Smith submits that the district-court-first
assignment order systematically excluded African-
Americans from Kent County Circuit Court venires. Brief
for Respondent 46–48. But as the Michigan Supreme
Court not at all unreasonably concluded, *Smith*, 463
Mich., at 205, 615 N. W. 2d, at 3, Smith's evidence scarcely
shows that the assignment order he targets caused under-
representation. Although the record established that
some officials and others in Kent County *believed* that the
assignment order created racial disparities, and the
County reversed the order in response, *supra,* at 5, the
belief was not substantiated by Smith's evidence.

Evidence that African-Americans were underrepre-
sented on the Circuit Court's venires in significantly
higher percentages than on the Grand Rapids District
Court's could have indicated that the assignment order
made a critical difference. But, as the Michigan Supreme
Court noted, Smith adduced no evidence to that effect.
See *Smith*, 463 Mich., at 205, 615 N. W. 2d, at 3. Nor did
Smith address whether Grand Rapids, which had the
County's largest African-American population, "ha[d] more

----

3.57%; comparative disparities "rang[ing] from 38.17% to 51.22%");
*United States* v. *Royal*, 174 F. 3d 1, 10 (CA1 1999) (2.97% absolute
disparity; 61.1% comparative disparity); *United States* v. *Rioux*, 97
F. 3d 648, 657–658 (CA2 1996) (2.08% absolute disparity; 29% com-
parative disparity); *State* v. *Gibbs*, 254 Conn. 578, 591–593, 758 A. 2d
327, 337–338 (2000) (2.49% absolute disparity; 37% comparative
disparity).

need for jurors per capita than [any other district in Kent County]." Tr. of Oral Arg. 26; *id.,* at 18, 37. Furthermore, Smith did not endeavor to compare the African-American representation levels in Circuit Court venires with those in the Federal District Court venires for the same region. See *id.,* at 46–47; *Duren*, 439 U. S., at 367, n. 25.

Smith's best evidence of systematic exclusion was offered by his statistics expert, who reported a decline in comparative underrepresentation, from 18 to 15.1%, after Kent County reversed the assignment order. See *supra,* at 5. This evidence—particularly in view of AEDPA's instruction, §2254(d)(2)—is insufficient to support Smith's claim that the assignment order caused the underrepresentation. As Smith's counsel recognized at oral argument, this decrease could not fairly be described as "a big change." Tr. of Oral Arg. 51; see *ibid.* (the drop was "a step in the right direction"). In short, Smith's evidence gave the Michigan Supreme Court little reason to conclude that the district-court-first assignment order had a significantly adverse impact on the representation of African-Americans on Circuit Court venires.

## C

To establish systematic exclusion, Smith contends, the defendant must show only that the underrepresentation is persistent and "produced by the method or 'system' used to select [jurors]," rather than by chance. Brief for Respondent 38, 40. In this regard, Smith catalogs a laundry list of factors in addition to the alleged "siphoning" that, he urges, rank as "systematic" causes of underrepresentation of African-Americans in Kent County's jury pool. *Id.,* at 53–54. Smith's list includes the County's practice of excusing people who merely alleged hardship or simply failed to show up for jury service, its reliance on mail notices, its failure to follow up on nonresponses, its use of residential addresses at least 15 months old, and the

refusal of Kent County police to enforce court orders for the appearance of prospective jurors. *Ibid.*

No "clearly established" precedent of this Court supports Smith's claim that he can make out a prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation. Smith recites a sentence in our *Duren* opinion that, he says, placed the burden of proving causation on the State. See Tr. of Oral Arg. 33, 35. The sentence reads: "Assuming, *arguendo*, that the exemptions mentioned by the court below [those for persons over 65, teachers, and government workers] would justify failure to achieve a fair community cross section on jury venires, the State must demonstrate that these exemptions [rather than the women's exemption] caused the underrepresentation complained of." 439 U. S., at 368–369. That sentence appears after the Court had already assigned to Duren— and found he had carried—the burden of proving that the underrepresentation "was due to [women's] systematic exclusion in the jury-selection process." *Id.,* at 366. The Court's comment, which Smith clipped from its context, does not concern the demonstration of a prima face case. Instead, it addresses what the State might show *to rebut* the defendant's prima facie case. The Michigan Supreme Court was therefore far from "unreasonable," §2254(d)(1), in concluding that *Duren* first and foremost required Smith himself to show that the underrepresentation complained of was "due to systematic exclusion." *Id.,* at 364; see *Smith*, 463 Mich., at 205, 615 N. W. 2d, at 3.

This Court, furthermore, has never "clearly established" that jury-selection-process features of the kind on Smith's list can give rise to a fair-cross-section claim. In *Taylor*, we "recognized broad discretion in the States" to "prescribe relevant qualifications for their jurors and to provide reasonable exemptions." 419 U. S., at 537–538. And in *Duren*, the Court understood that hardship exemptions

resembling those Smith assails might well "survive a fair-cross-section challenge," 439 U. S., at 370.[6]  In sum, the Michigan Supreme Court's decision rejecting Smith's fair-cross-section claim is consistent with *Duren* and "involved [no] unreasonable application o[f] clearly established Federal law," §2254(d)(1).

*    *    *

For the reasons stated, the judgment of the Court of Appeals for the Sixth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

───────────

[6] We have also never "clearly" decided, and have no need to consider here, whether the impact of social and economic factors can support a fair-cross-section claim.  Compare *Smith*, 463 Mich., at 206, 615 N. W. 2d, at 3 ("[T]he influence of social and economic factors on juror partici-pation does not demonstrate a systematic exclusion of [a distinctive group]."), with 543 F. 3d 326, 341 (CA6 2008) (case below) ("[T]he Sixth Amendment is concerned with social or economic factors when the particular *system* of selecting jurors makes such factors relevant to who is placed on the qualifying list and who is ultimately called to or ex-cused from service on a venire panel.").

# SUPREME COURT OF THE UNITED STATES

───────────

No. 08–1402

───────────

## MARY BERGHUIS, WARDEN, PETITIONER *v.* DIAPOLIS SMITH

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[March 30, 2010]

JUSTICE THOMAS, concurring.

The text of the Sixth Amendment guarantees the right to a trial by "an impartial jury." Historically, juries did not include a sampling of persons from all levels of society or even from both sexes. See, *e.g.*, Alschuler & Deiss, A Brief History of the Criminal Jury in the United States, 61 U. Chi. L. Rev. 867, 877 (1994) (In 1791, "[e]very state limited jury service to men; every state except Vermont restricted jury service to property owners or taxpayers; three states permitted only whites to serve; and one state, Maryland, disqualified atheists"); *Taylor* v. *Louisiana*, 419 U. S. 522, 533, n. 13 (1975) ("In this country women were disqualified by state law to sit as jurors until the end of the 19th century"). The Court has nonetheless concluded that the Sixth Amendment guarantees a defendant the right to a jury that represents "a fair cross section" of the community. *Ante*, at 1 (citing *Taylor*, *supra*).

In my view, that conclusion rests less on the Sixth Amendment than on an "amalgamation of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment," *Duren* v. *Missouri*, 439 U. S. 357, 372 (1979) (Rehnquist, J., dissenting), and seems difficult to square with the Sixth Amendment's text and history. Accordingly, in an appropriate case I would be willing to reconsider our precedents articulating the "fair cross section"

requirement. But neither party asks us to do so here, and the only question before us is whether the state court's disposition was contrary to, or an unreasonable application of, our precedents. See *ante*, at 2−3, 8−10; 28 U. S. C. §2254(d). I concur in the Court's answer to that question.