# IN THE SUPREME COURT OF IOWA

No. 20–1000

Submitted October 20, 2021—Filed January 21, 2022

**STATE OF IOWA,**

Appellee,

vs.

**KEVIN PLAIN SR.,**

Appellant.

Appeal from the Iowa District Court for Black Hawk County, William P. Wegman, District Associate Judge.

The defendant appeals the district court's denial on remand of his motion challenging the representativeness of the jury pool under the fair-cross-section requirements under the Sixth Amendment of the United States Constitution. **AFFIRMED.**

McDermott, J., delivered the opinion of the court, in which all justices joined.

Gary Dickey (argued) of Dickey, Campbell, and Sahag Law Firm, PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellee.

David S. Walker (argued), Windsor Heights, and Russell E. Lovell, II, Des Moines, for amicus curiae NAACP.

**McDERMOTT, Justice.**

A jury in Black Hawk County found Kevin Plain guilty of harassment in the first degree. Plain, an African-American, appealed his conviction, arguing that his right to an impartial jury under the United States Constitution and the Iowa Constitution had been violated because his jury panel contained only one African-American out of forty-nine potential jurors that appeared for trial. On appeal, we remanded the case to give Plain an opportunity to develop his impartial-jury arguments in response to refinements to how a defendant must prove a constitutional violation that we explained in his and other cases after his trial. The district court ultimately rejected Plain's further-developed claims. Plain now appeals that ruling.

**I. Facts Developed on Remand.**

We described the underlying facts from Plain's trial and earlier procedural history of this case in the opinion filed in Plain's initial appeal and will forego restating them here. *See State v. Plain* (*Plain I*), 898 N.W.2d 801, 809–10 (Iowa 2017). Pertinent to this appeal are the facts that the parties developed on remand related to the only remaining issue in the case: Plain's fair-cross-section claim.

Before continuing, we offer first a few definitions for clarity and consistency. The jury *pool* refers to members of the community summoned for jury duty and reporting to the courthouse for a particular time period. Iowa Code § 607A.3(6) (2017). The jury *panel* refers to members of the pool directed to a particular courtroom after they arrive at the courthouse to serve as possible jurors for a specific trial. *Id.* § 607A.3(10). The *jury* refers to the group actually

selected for a specific trial and generally given the power to decide questions of fact and return a verdict in the case. *See* Iowa R. Crim. P. 2.18. One can think of each of these groups as concentric circles: from the community, we draw the pool; from the pool, we draw the panel; and from the panel, we draw the jury.

Evidence presented in the district court on remand showed that the jury selection process for Plain's trial in 2015 began with the Black Hawk County jury manager, Billie Treloar, sending a jury summons to 100 people. If the post office returned a summons as undeliverable, Treloar would attempt to find an updated address using the court and Iowa Department of Transportation databases available to her. Sometimes the post office would return undeliverable mail with an updated address for the recipient. If Treloar could find an updated address, she would resend the summons; if not, the summons would remain undelivered.

The jury summons instructed jurors to complete and return a juror questionnaire within seven days. Treloar would send a reminder letter to summoned jurors who failed to return their questionnaires after three weeks. Summoned jurors who failed to appear at the courthouse would be summoned again for an ensuing jury trial. Treloar would send letters to summoned jurors who failed to appear at the courthouse after their first and second summonses, reminding them of their legal obligation to appear. If a summoned juror failed to appear for a third time, the court would set the matter for hearing to determine whether the summoned juror should be held in contempt of court. The punishment following a finding of contempt was usually a monetary fine.

The juror questionnaire in 2015 invited summoned jurors—but didn't require them—to answer a question about their race. As a result, of the 100 jurors summoned, the races of only 84 could be determined. Seven of the 84 were African-American. Of the 100 potential jurors summoned, the parties agree (despite some discrepancy in the record) that 49 summoned jurors actually appeared at the courthouse for trial. Only 1 of the 49 was African-American.

The district court retained Paula Hannaford-Agor, the Director of the National Center for State Courts for Jury Studies, to testify as a court-appointed expert on jury issues. Hannaford-Agor reviewed the county's jury composition data from the year leading up to Plain's trial. She found that about half of all summoned jurors in this data set failed to identify a race on the questionnaire. Hannaford-Agor created two different models using a method called "geocoding"—which looks at geographic information (such as a person's address) to infer demographic information (in this case, the person's race)—to extrapolate the races of summoned jurors. Plain also offered two written reports from statisticians that provided statistical analysis of the figures reported by Treloar and Hannaford-Agor.

Hannaford-Agor's first model estimated the racial composition of all jurors based entirely on the juror's zip code. The second model used the same method but predicted the races of only those jurors who didn't report their race on the questionnaires, which she then added to the actual reported data for those who did. Hannaford-Agor found that, under either model, African-Americans were summoned for jury service at a rate that slightly exceeded their prevalence

among all eligible jurors in the county. But African-American representation fell as a percentage of those who returned questionnaires and fell even further among those who appeared for jury service. Hannaford-Agor determined that the decreases at each stage were likely due to disproportionately high nonresponse, undeliverable, and failure-to-appear rates among the residents of one particular zip code in which fifty-seven percent of all African-Americans in the county resided.

## II. The *Duren/Plain* Elements.

The Sixth Amendment to the United States Constitution guarantees the right to "an impartial jury of the state and district wherein the crime shall have been committed." U.S. Const. amend VI. The Iowa Constitution similarly guarantees the right to a "trial by an impartial jury." Iowa Const. art. I, § 10. The constitutional guarantees of an impartial jury entitle the accused to a jury "drawn from a fair cross-section of the community." *Plain I*, 898 N.W.2d at 821.

A defendant establishes a prima facie violation of the fair-cross-section requirement by showing that (1) a group alleged to have been excluded is a "distinctive" group in the community, (2) the group's representation in jury pools is not "fair and reasonable" when considered against the group's percentage in the community, and (3) the group's underrepresentation "is due to systematic exclusion of the group in the jury-selection process." *Id.* at 822 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). The defendant bears the burden of proof to show a prima facie violation of the fair-cross-section requirement. *Id.* at 821–

22; *see also Duren*, 439 U.S. at 363–64; *State v. Lilly* (*Lilly I*), 930 N.W.2d 293, 299 (Iowa 2019).

The State concedes the first *Duren/Plain* prong and thus that African-Americans constitute a distinctive group in the community. The contest involves the second and third prongs. The district court held that Plain failed to prove either one. We review challenges alleging the denial of constitutional rights—in this case, the right to an impartial jury—de novo and thus evaluate the evidence anew without deferring to the district court's findings. *Lilly I*, 930 N.W.2d at 298.

**A. The Scope of the Remand and Our Review on Appeal.** Plain asks us to evaluate his claims under both the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution. In *Plain I*, we held that Plain hadn't raised a claim under the Iowa Constitution in the district court. *Plain I*, 898 N.W.2d at 821 n.6. We thus limited the remand to his Sixth Amendment claims. *Id.* at 829. But Plain argues that the district court on remand nonetheless analyzed his arguments under the Iowa Constitution by addressing the second prong's standard under *Lilly I*. *Lilly I* includes an analysis of claims under article I, section 10 of the Iowa Constitution. From this, Plain infers, the district court both ruled on and preserved for our review his claims under the Iowa Constitution.

As an initial matter, the district court's analysis in its ruling of *Lilly I* doesn't mean that the district court ruled on the merits of Plain's claims under the Iowa Constitution. The district court, in any event, lacked the authority to rewrite our remand order to address claims that we rejected and refused to

remand. *See City of Okoboji v. Iowa Dist. Ct.*, 744 N.W.2d 327, 331 (Iowa 2008). "[W]e have repeatedly observed that a district court, on remand of a case for some special purpose, 'is limited to do the special thing authorized by this court in its opinion, and nothing else.' " *Id.* (quoting *Kuhlmann v. Persinger*, 154 N.W.2d 860, 864 (Iowa 1967)). We specified, in the clearest of terms, the law to be applied on remand: "[W]e conditionally affirm Plain's conviction and remand to the district court for development of the record *on the Sixth Amendment* challenge. Following proper development of the record pertaining to *that* challenge, the district court shall determine whether Plain's right to a representative jury *under the Sixth Amendment* was violated." *Plain I*, 898 N.W.2d at 829 (emphases added).

Plain needed to raise a fair-cross-section challenge under the Iowa Constitution *before* trial. *State v. Williams*, 929 N.W.2d 621, 629 n.1 (Iowa 2019). As we already determined, he didn't. *Plain I*, 898 N.W.2d at 821 n.6. The district court lawfully could not—and, in fact, did not—venture beyond the scope of its charge on remand. We thus will address Plain's claims under the Sixth Amendment of the United States Constitution only.

**B. Plain's Proof of Causation Under *Duren/Plain*'s Third Prong.** We will begin our analysis on the third prong, since an inability to establish any one of the three *Duren/Plain* elements is fatal to a defendant's fair-cross-section challenge. To establish the third prong, a defendant must prove that the underrepresentation resulted from a particular feature (or features) of the jury selection system. *Plain I*, 898 N.W.2d at 823–24. The defendant, in other words, "must establish the exclusion is 'inherent in the particular jury-selection process

utilized' " and show that the practice caused the systematic exclusion of the distinctive group in the jury selection process. *Id.* at 824 (quoting *Duren*, 439 U.S. at 366).

Plain identifies three practices that he argues caused the underrepresentation of African-Americans in his jury pool: (1) the failure to update addresses when summonses were returned as "undeliverable," (2) the failure to follow up with jurors who didn't respond, and (3) the failure to hold jurors accountable through enforcement proceedings for failing to respond or appear. The district court addressed each argument on the merits, finding that Plain failed to prove "causation" as required on any of the claims.

In *State v. Veal*, we held that to prove a Sixth Amendment fair-cross-section violation, the defendant "must identify some practice or combination of practices that led to the underrepresentation, and it must be something other than the 'laundry list' the Supreme Court declined to condemn in *Berghuis* [*v. Smith*]." 930 N.W.2d 319, 330 (Iowa 2019) (quoting *Berghuis v. Smith*, 559 U.S. 314, 332 (2010)). Challenges to "run-of-the-mill" jury management practices, we said, are insufficient to show systematic exclusion under the Sixth Amendment. *Id.* at 329. We described run-of-the-mill jury management practices in *Lilly I* as "the relatively commonplace" practices that might include, for instance, "the updating of address lists, the granting of excuses, and the enforcement of jury summonses." *Lilly I*, 930 N.W.2d at 308. These common jury practices fall within a state's "broad discretion," according to the Supreme Court in *Berghuis*, and

will not sustain a cross-section challenge under the Sixth Amendment. *Berghuis*, 559 U.S. at 333 (quoting *Taylor v. Louisiana*, 419 U.S. 522, 537–38 (1975)).

Two of the three practices that Plain advances as causing the alleged systematic exclusion not only meet the definition of a "run-of-the-mill jury management practice" that we set out in *Lilly I*, but in fact are practices that we offered as *exemplars* of run-of-the-mill jury management practices. *Lilly I*, 930 N.W.2d at 308. Plain's claim that Black Hawk County failed to update addresses when summonses were returned as "undeliverable," and failed to hold jurors accountable through enforcement proceedings for not responding or appearing, thus don't help him. They are, by straightforward application of our own illustrations, run-of-the-mill practices that we previously said will *not* constitute evidence of causation.

The third practice that Plain points to as causing the underrepresentation—failing to follow up with jurors who didn't respond—isn't one of the explicit examples of run-of-the-mill practices that we previously offered. But it, too, unquestionably falls within the category. In *Berghuis*, the Supreme Court, when describing the defendant's "laundry list" of commonplace jury management practices, included the county's alleged "failure to follow up on nonresponses" from summoned jurors. *Berghuis*, 559 U.S. at 332.

All three of the practices that Plain presents as "causing" the alleged underrepresentation under the third prong amount to run-of-the-mill practices that the Supreme Court has declined to condemn. *Veal*, 930 N.W.2d at 330

(citing *Berghuis*, 559 U.S. at 332). He thus has not proved a fair-cross-section violation under the Sixth Amendment.

Because Plain failed to deliver on his burden under the third prong, which on its own is sufficient to affirm the district court's denial of his claim, we need not take up his arguments relating to the second prong's requirement to establish actual underrepresentation of African-Americans in his jury pool.

**C. The "Run-of-the-Mill" Limitation in *Veal*.** Plain argues that our refusal to consider run-of-the-mill jury management practices to establish the third prong's systemic exclusion under the Sixth Amendment hinges on a misreading of *Berghuis*, and he asks us to overrule our holding in *Veal* on this point. Plain argues that *Berghuis* was an appeal from a federal habeas corpus petition and that the question presented turned on whether the lower court's denial of the defendant's fair-cross-section claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Plain contends that the *Berghuis* Court applied the deferential analysis required under the Antiterrorism and Effective Death Penalty Act of 1996 and thus simply looked at whether the lower court unreasonably applied clearly established federal law. Under Plain's reading, *Berghuis* doesn't address whether the challenged jury management practices could be offered to establish systematic exclusion.

But this characterization reads *Berghuis* too narrowly, particularly in its limited treatment of the Court's reliance on *Duren*. The "unreasonable

application of federal law" question centered on the application of *Duren* itself. *Duren* is among the Supreme Court's leading cases on the issue of systemic exclusion. *See Plain I*, 898 N.W.2d at 821–24 (analyzing *Duren*'s three-part test for establishing a violation of the fair-cross-section requirement). The Supreme Court first noted that the defendant "catalogs a laundry list of factors" that, he claims, "rank as 'systematic' causes of underrepresentation of African-Americans in Kent County's jury pool." *Berghuis*, 559 U.S. at 332. Jury management practices such as those on the defendant's "laundry list," according to the Court in *Berghuis*, were unlikely, based on the holding in *Duren*, to sustain a fair-cross-section challenge under the Sixth Amendment. *Id.* at 333 (citing *Duren*, 439 U.S. at 370). The Court noted that it "has never 'clearly established' that jury-selection-process features of the kind on [the defendant]'s list can give rise to a fair-cross-section claim." *Id.* On the contrary, the Court stated that these practices fall within the "broad discretion" already granted to the states to establish juror qualifications and to implement their own jury management processes. *Id.* (quoting *Taylor*, 419 U.S. at 537–38).

We thus find no error in our prior interpretation—or current application—of *Duren* and *Berghuis* to bar Sixth Amendment challenges that allege systemic exclusion as a consequence of run-of-the-mill jury management practices.

**III. Conclusion.**

In *Plain I*, we conditionally affirmed Plain's conviction and remanded for a determination on his fair-cross-section challenge. We now affirm the district

court's holding on remand that Plain failed to prove a violation of his Sixth Amendment right to an impartial jury, and affirm his conviction.

**AFFIRMED.**