[Cite as *State v. Bass*, 2014-Ohio-2915.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                              :

      Plaintiff-Appellee,                          :

v.                                                         :              No. 13AP-1052
                                                                      (C.P.C. No. 01CR-6524)
James D. Bass,                                             :
                                                                      (REGULAR CALENDAR)
      Defendant-Appellant.                         :

D E C I S I O N

Rendered on June 30, 2014

*Ron O'Brien*, Prosecuting Attorney, *Laura Swisher* and *Barbara A. Farnbacher*, for appellee.

*Carpenter Lipps & Leland LLP*, and *Kort Gatterdam*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

TYACK, J.

{¶ 1} Defendant-appellant, James D. Bass, is appealing from the trial court's ruling on his motion for leave to file a motion for new trial. His assignment of error reads:

THE TRIAL COURT ERRED IN DENYING BASS'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL.

{¶ 2} Miles Davis was shot and killed in the early morning hours of September 11, 1999 at the Shell gas station located on Lockbourne Road on the south side of Columbus. There were dozens of people in and around the gas station when the shooting occurred.

{¶ 3} There is no doubt that Bass was present at the scene of the homicide. He was found lying in some bushes nearby with a gunshot wound to his leg. He now acknowledges having fired a gun that night, but claims he shot into the air, not at the

victim. Initially, however, Bass denied to police that he had a gun that night. Bass claimed that he heard 10 to 11 gunshots, but none were from a gun he had fired.

{¶ 4} Later, after police had received a report Bass was the shooter, Bass acknowledged that the gun he had was a TEC-9. The bullet which killed Davis was consistent with a TEC-9, but ballistics testing could not establish that the TEC-9 Bass had was the murder weapon. Similarly, the type of ammunition in Bass's TEC-9 was consistent with the projectile which killed the victim, but Bass's ammunition could not be identified as matching the projectile.

{¶ 5} In 2000 and 2001, shortly after the shooting, Bass worked as an informant for Columbus police giving information and helping to gather evidence about drug trafficking and gang activity in the Columbus area. He even went to the point of wearing a body wire in controlled drug buys. Due to fears for Bass's safety, the prosecutor's office made a tape of a deposition of Bass that would be used as evidence should Bass become unavailable to testify. The tape of Bass unfortunately made it out of the prosecutor's office, was copied, and was made available for sale in various record stores and other places around Columbus. This heightened concerns for the safety of Bass and even for his family. As a result, the State took steps to protect him as he was now widely known as someone who was working with the police. (Tr. Vol. I, 74.)

{¶ 6} Bass was indicted on November 2, 2001 and charged with the murder of Davis. Between the time of the shooting and the indictment, Bass's information had led to many gang members being arrested, especially members of the Deuce-Deuce Bloods, a gang with which Bass had been affiliated. Bass now argues that his cooperation with the State had a chilling effect on his ability to mount an effective defense to the murder charge. No one from the neighborhood would provide evidence to support his claims of innocence; and no witnesses would make themselves available to Bass's investigator to be interviewed.

{¶ 7} Bass argues that key witnesses at his trial lied in retaliation for his being an informant. Bass asserts that some witnesses, including Anthony Forrest, initially would have testified more favorably on behalf of Bass but then testified against him after it became publicly known that Bass was an informant. (Tr. Vol. I, 70.)

{¶ 8} Bass went to trial and was convicted by a jury. On April 24, 2002, he was sentenced to a total of 18 years to life for murder with a firearm specification. He pursued an initial appeal before this court and we affirmed his conviction.

{¶ 9} Bass did not pursue an appeal to the Supreme Court of Ohio in the time allowed. His later effort to pursue an appeal to that court was disallowed.

{¶ 10} Bass now is attempting to pursue a motion for a new trial, claiming he was wrongly convicted and that one or more of the State's witnesses perjured themselves when they testified against him.

{¶ 11} Crim. R. 33 sets forth the requirements the defendant must follow for a new trial:

> **(A) Grounds**. A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
>
> * * *
>
> (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. * * *
>
> **(B) Motion for new trial; form, time.** Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.
>
> Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he

was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

{¶ 12} We have previously summarized the conditions an appellant must meet in order to be entitled to leave to file a delayed motion for new trial:

> To obtain leave to file a motion for new trial based upon prosecutorial misconduct, appellant must demonstrate "by clear and convincing proof" that he was "unavoidably prevented" from filing the motion within the 14-day time period. Crim.R. 33(B). To obtain leave to file a motion for a new trial based on newly discovered evidence, appellant must demonstrate by "clear and convincing proof" that he was "unavoidably prevented" from discovering the evidence relied upon to support the motion within the 120-day time period. '[A] party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence.'

*State v. Golden*, 10th Dist. No. 09AP-1004, 2010-Ohio-4438, ¶ 9, quoting *State v. Walden*, 19 Ohio App.3d 141, 145-46 (10th Dist.1984).

{¶ 13} We review a court's denial of a motion for leave to file a delayed motion for new trial under an abuse of discretion standard. *State v. Townsend*, 10th Dist. No. 08AP-371, 2008-Ohio-6518. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An abuse of discretion connotes more than an error of judgment; it implies a decision that is arbitrary or capricious, one that is without a reasonable basis or clearly wrong. *Pembaur v. Leis*, 1 Ohio St.3d 89 (1982); *In re Ghali*, 83 Ohio App.3d 460 (10th Dist.1992).

{¶ 14} Counsel centers their arguments around the following issue: "When the State's failure to disclose exculpatory evidence is the reason the defendant was unable to timely file a motion for new trial, a due process analysis must be applied on whether the defendant was unavoidably prevented from discovering the new evidence; the state must not benefit form its failure to disclose." (Appellant brief, at IV.)

{¶ 15} Bass argues in his brief what exculpatory evidence he was unavoidably prevented from discovering, which would be filed with his motion for new trial if the court grants him leave to do so.

{¶ 16} Darrell Farr was a witness for the State testifying that he saw Bass shoot Davis. (Tr. Vol III, 213.) Farr was arrested as part of the September 2001 gang sweep that netted most of the Deuce-Deuce Bloods. (Tr. Vol. III, 223.) Bass asserts that Farr agreed to provide an affidavit recanting his trial testimony for the new trial motion. Martin Yant, a private investigator for Bass, claims that Farr stated he (Farr) was not present at the Davis shooting. Farr claimed he perjured himself to get a better deal in his own criminal case. Farr stated he was willing to sign an affidavit that he did not witness the shooting. (R. 253, exhibit F.) Farr was shot and killed in August 2010 before he signed any affidavit. Farr likewise would not be available to testify from this point onward, either at a hearing on a motion for new trial or at a new trial.

{¶ 17} A reading of Farr's trial testimony strains credibility; including claims that he did not know what a .380 caliber revolver is or that he did not know that Bass was an informant until Farr was on the witness stand at Bass's trial. Also Farr claimed he did not know that Miles Davis was a member of the Southfield Crips, a street gang and rival of the Deuce-Deuce Bloods. (Tr. Vol. III, 233-34.) Eddie Cartharn, who did not testify at trial but witnessed the shooting, claimed in a 2011 affidavit that Farr admitted that he was not at the gas station when the shooting occurred and testified against Bass to cut a better deal for himself. (R. 253, exhibit P.) If true, Farr's testimony as to all the key points was perjury. Farr's statements to Yant and to Cartharn might well not be admissible as evidence in subsequent proceedings.

{¶ 18} Kendle Mardis was identified with the Deuce-Deuce Blood gang of which Bass was affiliated. (Tr. Vol. I, at 58.) After the September 2001 gang sweep, Mardis gave information that led Columbus Police to ask Bass about his TEC-9 which was suspected as the murder weapon. (R. 253, exhibit B.) Mardis told police that Bass was responsible for the murder, that after Bass was shot in the leg, Bass and two other people arrived by car at Mardis's after hours place. (R. 253, exhibit B.) Mardis told the police that Bass gave him his TEC-9 to clean and told Mardis to keep the gun for him before going to the hospital. *Id.* This story by Mardis was factually unlikely as Bass was found by

Police Officer Todd Schiff shot in the leg in the yard of 1483 Lockbourne Rd. near the Shell gas station where the killing occurred right after the shooting of Davis. Bass was taken from there to the hospital. *Bass v. State*, 10th Dist. No. 02AP-547, 2003-Ohio-1642, ¶ 17.

{¶ 19} This conversation with Mardis led police to question Bass about the TEC-9 Bass owned and could still locate. Bass argues that police suspicion of Bass as the shooter of Davis was renewed despite the parts of Mardis's report which was fabrication.

{¶ 20} Carlotta Butler testified against Bass at trial stating that she saw Bass fire six or seven shots total. (R. 138, Tr. Vol. IV, at 11.) Bass argues that, initially, he identified Butler as a witness for the defense but after her brother was arrested in the September 2001 gang sweep, she came to the police in October 2001 to give a statement against Bass. (R. 135, Vol. I, at 59). Butler also admitted on the stand that the prosecutor was going to talk to a judge about having her released early on her 30-day sentence for a traffic violation. (R. 138, Tr. Vol. IV, at 4.)

{¶ 21} At trial, ballistics expert, Mark Hardy, tested the TEC-9 that was recovered in January 2000 after Bass helped them locate it. The gun jammed when Hardy test fired it. (R. 138, Vol. IV, at 75.) This was consistent with Bass's story that he fired into the air once but then the gun jammed. (R. 253, exhibit C.) Hardy also testified that the bullet recovered from Davis's body could have been fired from the TEC-9 but there were not enough individual characteristics to say that Bass's gun was the gun that fired the fatal bullet. (R. 138, Vol. IV, at 78.)

{¶ 22} Hardy also testified that the bullet that killed Davis could not have come from another gun that discharged 9mm shell casings found at the scene of the homicide based on rifling characteristics. (R. 138, Vol. IV, at 85-86). The fatal bullet could have come from the gun that shot the .380 caliber ammunition casings that were found at the scene but the bullet from the body was inconsistent with the .380 ammunition. (R. 138, Vol. IV, at 85-86.) Bass now claims that the bullet that struck his leg and remains there today could be safely removed and compared to the bullet that killed Davis. At present, the projectile is still in Bass.

{¶ 23} Anthony Forrest is Davis's cousin. Our court summarized his testimony in the earlier appeal:

> The decedent's cousin, Anthony Forrest, testified that he saw Jermaine Dickerson and another person arguing. He heard one gunshot and ducked. Forrest did not remember seeing appellant at the gas station. He did not see who Dickerson was arguing with nor did he see anyone firing a gun, but he heard approximately 10 shots. Dickerson told Forrest that appellant shot Davis.

*State v. Bass*, 10th Dist. No. 02Ap-547, 2003-Ohio-1642, ¶ 29.

{¶ 24} Jermaine Dickerson, a suspected Southfield Crip and therefore gang rival of the Deuce-Deuce Bloods, did not testify. However, Antony Forrest's excited utterance that Dickerson told Forrest that Bass shot Davis was admitted as evidence. Two tapes of Dickerson were played in court at the trial. (R. 140, Vol. VI, at 5.) Defense counsel allowed the two tapes to be played, one from September 11, 1999 and the other from October 7, 1999, to demonstrate prior inconsistent statements made by Dickerson. The tapes were only being offered to evaluate Dickerson's credibility. Bass claims Dickerson was the shooter and shot both Bass in the leg and accidentally shot Davis.

{¶ 25} Bass claims the police reports that he became aware of after a public record request was made in 2008 corroborate many elements of his version of events that he did not shoot Davis. A confidential police interview on April 9, 2000 stated that Davis was shot by one of his own gang, Jermaine [Dickerson] or D.R., accidently. (R. 253, exhibit I.) A separate confidential police report relays informant information from two different sources that Davis was not killed by Bass and that Davis was accidently killed. (R. 253, exhibit M.) This source of the information in the interview and report is not known.

{¶ 26} A police interview with Willia Alexander, an elderly women who was working at 1483 Lockbourne Road, revealed that she stated in two different interviews that she saw Bass running through the Shell gas station as shots were still being fired, and she stated that she saw an "Uzi" being slid across the hood of the car that Dickerson and Davis had been driving. (R. 253, exhibit Q.) Eddie Cartharn, mentioned earlier, stated in a March 16, 2000 police interview that he saw Dickerson shooting at a black man with braided hair, but accidently shoot his friend "Dirt" [Davis] in the back. (R. 253, exhibit J.) Eddie Cartharn stated in a 2011 affidavit that he saw Bass running in the other direction of the shooting before Davis was shot. (R. 253, exhibit P.)

{¶ 27} There are many police interviews from the incident, and information from informants, that state that Bass was not initially arguing with Dickerson.

{¶ 28} Ron Hale gave an interview to the police on September 14, 1999, stating that he heard the same version of events from two different individuals. Hale stated he heard that Dickerson was arguing with James Thomas, then someone fired a gunshot after which Dickerson shot Bass and then continued shooting, when Hale turned around Dickerson had shot Davis. (R. 253, exhibit K.)

{¶ 29} The same Ron Hale, in a October 7, 1999 police interview, stated that he saw Bass fire one gunshot into the air, and observed Bass running north through the parking lot after getting shot in the leg, and that Dickerson fired numerous shots in the direction of Bass. (R. 253, exhibit L.) Hale also provided a lot of detailed information about the gas station, which cars people were driving, the positions of the two gangs, even that Dickerson was in an argument with James Thomas. Hale had driven with Bass to the gas station, so presumably was known to Bass as a potential witness long before Bass's trial.

{¶ 30} Bass's trial attorney, William Owen, stated in an affidavit that after reviewing the newly discovered police reports, he believes he had never seen that information and that he definitely would have made use of it prior to trial. (R. 267, Affidavit of William Owen, at ¶ 4.) Owen was unable to locate his trial file to confirm that he never had seen those reports. *Id.* Owen is unable to state with certainty what discovery he did or did not have before trial with the exception of two documents that were submitted with Bass's motion for a new trial. (R. 267, Affidavit of William Owen, at ¶ 5.) We cannot determine which two documents Owen is referring to of the many submitted with the motion seeking leave to file a motion for a new trial, though they are most likely the April 9, 2000 CPD confidential police interviews. (R. 253, exhibit I, M.)

{¶ 31} Bass argues that he was entitled to the security camera footage from the Shell gas station that the police obtained. The only information about the fate of this tape, is that it was in the possession of an assistant prosecuting attorney on December 5, 2001, but it was never entered into evidence at trial. (R. 253, exhibit G.) Its existence was clearly known before the trial.

{¶ 32} Knowing exactly what happened when rival gang members begin shooting in a public place is a significant challenge for police and eventually for a trier of fact in a

courtroom. What is clear from the record before us is that Bass was a member of the Deuce-Deuce Bloods and Davis was a member of the rival Southfield Crips.

{¶ 33} Bass was found shot in the leg near where Davis was shot to death. Bass claimed to police that he was unarmed when Davis was shot.

{¶ 34} Later when police confronted Bass with reports that Bass was known to carry a TEC-9, Bass admitted that he had such a firearm at the scene of the killing and he admitted he had shot his TEC-9, but only as one of the ten or eleven gunshots heard at the time of killing. As noted earlier, another witness claimed she saw Bass shoot several times.

{¶ 35} Bass denied shooting Davis and has pointed the finger at different people at different times. Bass, soon after the shooting, aligned himself with the police and began working as an undercover informant.

{¶ 36} Bass apparently helped police arrest both members of his own gang and members of the rival gang. As a result of the his police activity, few people in the neighborhood trusted him. Certainly no one would get on a witness stand and commit perjury to help Bass defend himself at trial. Some witnesses no doubt were tempted to stretch the truth or even perjure themselves in payback for Bass hurting them, or their friends and family members. This was especially so if the potential witness could help themselves in their own cases, by pleasing the police or prosecution.

{¶ 37} The problems with the State's case were developed at trial. The problems with Bass's own credibility were also fully explored.

{¶ 38} Some of the police reports put forth at trial were problematic. Bass could well have shot Davis and then fled when shots were still being fired. Willia Alexander's version of what happened did not fully exonerate Bass and her claims of an Uzi being involved were unlikely. We also cannot be sure Bass was not one of the "confidential informants" who told police other people shot Davis.

{¶ 39} We cannot fully evaluate the claims of Eddie Cartharn as to what happened but we also cannot know why Bass's defense team could not have known the names of him and many of the potential witnesses at the Shell Station since Bass admittedly was at the scene of the killing before and during the shooting.

{¶ 40} Motions for new trial shall be filed within 120 days of the verdict of guilty. Crim.R. 33. For a motion for a new trial to be filed outside this time window, the trial court judge must find that the defendant was unavoidably prevented from the discovery of the evidence upon which the defendant must rely. *Id.* The trial court judge here did not so find. After a full review of the information before the trial judge, we cannot say the trial court judge abused his discretion in coming to the decision to deny a belated motion for a new trial.

{¶ 41} The sole assignment of error is overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BROWN and CONNOR, JJ., concur.