[Cite as *State v. Whiteside*, 2015-Ohio-3490.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                              :

     Plaintiff-Appellee,               :

                                             No. 15AP-55
v.                                         :       (C.P.C. No. 85CR-2396)

Norman V. Whiteside,                       :       (REGULAR CALENDAR)

     Defendant-Appellant.              :

---

D E C I S I O N

Rendered on August 27, 2015

---

*Ron O'Brien*, Prosecuting Attorney, and *Stephen L. Taylor*, for appellee.

*Norman V. Whiteside*, pro se.

---

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1}  Defendant-appellant, Norman V. Whiteside, appeals from a decision of the Franklin County Court of Common Pleas, rendered on January 13, 2015,[1] which denied his motion for leave to file a delayed motion for a new trial. We overrule each of his four assignments of error and affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  On April 17, 1982, an 18-year-old student of Denison University, Laura Carter, was riding in a car with her parents and friends on their way to dinner during the university's designated "parents weekend" when a bullet passed through the side window of the car, missed the other occupants, and struck Carter in the chest. The bullet perforated her skin and chest muscles, passed under her collarbone, lacerated her trachea, several arteries, and tore a small hole in the upper lobe of her left lung before punching

---

[1] For reasons that are not clear from the record, there are two copies of the decision under appeal with two different date stamps, one with "December 8, 2014," and one with "January 13, 2015."

through her shoulder blade.  Her father rushed her to the emergency room of a nearby hospital where she died of exsanguination.

{¶ 3}  Carter was not the intended victim in this shooting.  The shooting related to tensions that had been building between groups of criminal offenders, drug-dealers, and forgers native to Columbus known as "the home team," and a group from Cleveland that was attempting to extort money from these criminal offenders, "the visiting team."  (Tr. 1015.)  After a period of time in which extortion attempts by the visiting team were ongoing, Whiteside, a forger for the home team, began to believe that something needed to be done about the visiting team and, in particular, one of its members, Melvin Thomas. Whiteside reasoned that as a group of criminal offenders themselves, the home team could not seek help from the police.  As a result, Whiteside formed the intent to kill Thomas.

{¶ 4}  On April 16, 1982, Whiteside, Michael Brown, and Jack Raymond, all members of the home team, traveled to a local gun shop where Brown purchased three guns.  Accounts vary as to what subsequently occurred; however, it is undisputed that John "Bubbles" Smith was shot in the leg the next morning, April 17, 1982, by Thomas of the visiting team.  Thereafter, the home team members Gordon and Paul Newlin carried out an attack with one of the purchased guns that ended in the unintended death of Carter rather than the death of Thomas.  *See, e.g.*, *State v.* [Paul] *Newlin*, 10th Dist. No. 95APA03-379 (Nov. 21, 1995); *State v.* [Gordon] *Newlin*, 10th Dist. No. 87AP-222 (June 23, 1988).

{¶ 5} Whiteside, who had a relationship with a number of members of the Columbus police and occasionally gave them information, obtained the murder weapon and turned it over to the Columbus Division of Police.  Shortly thereafter, on May 28, 1982, Whiteside appeared for an interview with several detectives, including the lead detective on the investigation, Detective Robert Young.  What was said during this interview and whether such statements were immunized became a subject of contention.

{¶ 6}  Initially, Whiteside was prosecuted in federal court for firearms violations based on his role in obtaining the guns to defend the home team and to dispose of the visiting team.  However, the Southern District of Ohio concluded that testimony from Detective Young was not credible and that the officers (including Young) who interviewed Whiteside on May 28 had promised Whiteside immunity and had not provided him a

statement of his Miranda rights.  *United States v. Whiteside*, S.D.Ohio No. CR-2-82-78 (Sept. 9, 1982).  The Southern District of Ohio excluded the contents of the interview from use at Whiteside's trial; Whiteside was acquitted on December 20, 1982.

{¶ 7}   Over two years after his acquittal in federal court, on August 27, 1985, plaintiff-appellee, State of Ohio, obtained an indictment against Whiteside for two counts of conspiracy to commit aggravated murder based on the same incidents leading to Carter's death.  On February 19, 1986, the case came before the trial court on a motion to suppress the statements Whiteside had made to police.  The trial court acknowledged that essentially the identical issue was before it as had been before the federal court.  Yet, because additional evidence was presented that Whiteside had, on previous occasions, perjured himself, the state trial court disagreed with the federal court, held that police had not offered Whiteside immunity, and overruled the motion to suppress.

{¶ 8}   On February 25, 1986, the trial began.  Among numerous other witnesses, the prosecution called Detective Young to the witness stand during the trial.  The trial court permitted Detective Young to testify that Whiteside had masterminded the failed ambush attempt that resulted in the unintended death of Carter, and had engaged in specific acts in furtherance of the conspiracy including obtaining and distributing the guns used.   Specifically, Detective Young testified that Whiteside admitted that he planned an ambush and distributed the guns at a meeting on April 17, 1982 at Whiteside's house at 111 ½ North 20th Street.   Though Whiteside testified that he had not "masterminded" an "ambush," his testimony largely confirmed Detective Young's testimony.  (Tr. 1063, 1096.)  Whiteside alleged that Detective Young made up the fact that Whiteside "masterminded" the conspiracy.  But Whiteside testified that he was present when the guns were purchased, he was present at his house when the guns were distributed, he felt he had to kill Thomas, and that he discussed ways of dealing with Thomas with the others.

{¶ 9}   On March 10, 1986, the jury returned a verdict of guilty on both counts of conspiracy to commit aggravated murder.   The trial court moved immediately to sentencing and sentenced Whiteside to 7-to-25 years on each of the two counts of conspiracy and ordered Whiteside to serve each of those sentences consecutively to the other and consecutively to the time Whiteside was already serving for a number of forgery convictions.  The sentencing entry was filed March 13, 1986.

{¶ 10} Whiteside filed an appeal on April 9, 1986. As a result of that appeal, on February 10, 1987, this court remanded the case to the trial court so it could merge the two conspiracy counts (in light of the fact that there was only one actual conspiracy) and resentence on a single count. On remand, the trial court, on March 30, 1987, sentenced Whiteside to a single term of 7-to-25 years upon a single count of conspiracy, to be served consecutively with the term of imprisonment he was already serving for forgery.

{¶ 11} After unsuccessful postconviction proceedings and considerable other litigation over the course of many years, on February 11, 2014, Whiteside filed a motion for leave to file a delayed motion for a new trial. Because his motion included allegations of dishonesty against Judge Patrick Sheeran (who had been a prosecutor in his case), Whiteside also requested that all judges of the Franklin County Court of Common Pleas be disqualified from ruling on his motion and that a visiting judge be appointed. To substantiate the request, Whiteside attached a 1994 affidavit in which Judge Sheeran as a prosecutor swore that he had no recollection of ever opposing Whiteside's parole and a 1992 statement offered to the parole board in which Judge Sheeran was reported as recommending that Whiteside never be released, promising to write a letter more fully stating his opposition to parole, and stating that "[Whiteside] is intelligent and is as pure evil as I've ever seen." (R. 219, Whiteside affidavit, exhibit A.) On April 1, 2014, all judges of the Franklin County Court of Common Pleas voluntarily recused themselves to avoid the appearance of impropriety. On April 4, 2014, the Supreme Court of Ohio ordered the appointment of a visiting judge to consider Whiteside's motion.

{¶ 12} In support of Whiteside's motion for leave to file a delayed motion for a new trial, Whiteside attached exhibits A-L. Some of these were directed to allegations that Judge Sheeran as a prosecutor had threatened to make, and, in fact, did make unfavorable recommendations to the state parole board in an effort to force Whiteside to testify against Gordon Newlin (one of the men ultimately convicted of participating directly in the shooting of Carter). However, as principally pertinent to the issues in this appeal, Whiteside attached three affidavits, one from himself, one from his sister, Regina Holland, and one from Michael Kelly. The gist of these three affidavits is that Kelly and Holland were present at the April 17, 1982 meeting in Whiteside's house at 111 ½ North 20th St. and would testify that Brown, not Whiteside, gave a gun to Smith which later turned out to be the gun that was used to cause Carter's death.

{¶ 13} On January 13, 2015, the visiting judge denied Whiteside's motion for a new trial. On January 26, 2015, Whiteside filed a notice of appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 14} Whiteside asserts four assignments of error for our review:

[I.] THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT'S MOTION FOR LEAVE FOR NEW TRIAL DESPITE HAVING CLEAR AND CONVINCING EVIDENCE BEFORE IT THAT SUCH NEW EVIDENCE EXISTED.

[II.] THE TRIAL COURT ABUSED, AND OVERSTEPPED, ITS AUTHORITY BY FUNCTIONING IN THE CAPACITY OF A COURT OF APPEALS, IN CONTRAVENTION OF THE CONSTITUTION OF OHIO, ARTICLE IV §§ 3&4, AND FRANKLIN COUNTY LOCAL RULE 31.01, BUT NOT LIMITED TO.

[III.] IT IS ERROR FOR A TRIAL COURT TO HAVE EVIDENCE THAT RACISM PROMPTED THE PROSECUTION OF THE CHARGES AND ULTIMATE CONVICTION AND NOT ADDRESS SAME IN ITS JUDGMENT, DESPITE THE CUMULATIVE INSTANCES THAT RESULTED IN AN ENTIRE COURT BEING DISQUALIFIED FROM HEARING THE CONCERNS RELATED TO APPELLANT'S MOTION.

[IV.] THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY MISQUOTING SIGNIFICANT PORTIONS OF APPELLANT'S MATERIAL EVIDENCE TO THE STATE'S BENEFIT WITHOUT GIVING THE EVIDENCE THE DEFERENCE IT DESERVED, AND BY ALLOWING HEARSAY EVIDENCE ON THE PART OF DETECTIVE YOUNG TO TAINT THE FINDINGS AND ULTIMATE JUDGMENT OF THE CASE.

## III. DISCUSSION

{¶ 15} Crim.R. 33 sets forth the bases for obtaining a new trial. Those elements relevant to Whiteside's appeal are:

(A) **Grounds.** A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

* * *

> (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial.

The rule also sets forth the timing for motions for new trials based on newly discovered evidence:

> (B) **Motion for new trial; form, time.**
>
> Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered * * *. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Crim.R. 33(B).

{¶ 16} A movant seeking a new trial on grounds of "new evidence" must show "by clear and convincing proof that he was unavoidably prevented from the discovery of the evidence pursuant to Crim.R. 33(B)." *State v. Townsend*, 10th Dist. No. 08AP-371, 2008-Ohio-6518, ¶ 7. "We review a court's denial of a motion for leave to file a delayed motion for new trial under an abuse of discretion standard." *State v. Bass*, 10th Dist. No. 13AP-1052, 2014-Ohio-2915, ¶ 13, citing *Townsend* at ¶ 8. " 'The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983) (citation omitted).

### A. First and Fourth Assignments of Error – Whether the Trial Court Adequately Considered Whether there was New Evidence Before the Trial Court that Whiteside was Unavoidably Prevented from Discovering

{¶ 17} On appeal, Whiteside has reduced the number of claimed sources of new evidence on which he proceeds to two. First, he claims new evidence in the discovery that Kelly saw the distribution of the gun that was used in causing Carter's death as well as the discovery of Kelly himself. Second, he claims new evidence in a contradiction discovered in the testimony given by a witness for the prosecution who testified first in Whiteside's trial and then later in the trial of Gordon Newlin.

{¶ 18} With respect to Whiteside's claim that Kelly's affidavit constitutes new evidence that he was heretofore prevented from discovering, we previously have decided cases similar to this one.  In *Townsend*, for instance, we commented:

> Although appellant states in his motion for leave that he had no knowledge "whatsoever" that [the two purportedly new witnesses] witnessed the shooting in question, and he did not discover that either of these men witnessed the shooting until August and October 2007, respectively, appellant does not explain why he was unavoidably prevented from discovering that these two men allegedly witnessed the shooting in a timely manner. Appellant was represented by counsel, and appellant fails to indicate why neither he nor his trial counsel were prevented from investigating the matter and discovering these two men witnessed the incident. Particularly of note is that one of the men * * * is appellant's brother.

*Id.* at ¶ 10; *see also State v. Wilson*, 10th Dist. No. 93AP-732 (Nov. 2, 1993).

{¶ 19} Similar to the situation in *Townsend*, Kelly was at the April 17, 1982 meeting in Whiteside's house at 111 ½ North 20th St. with Whiteside.  This is a fact that Whiteside would have known or should have known about for over 30 years, the meeting having occurred in April 1982.  Whiteside's sister was apparently also at the meeting.  Again, she, also, would have known or should have known for the last 30 years that Kelly was at the meeting.  We acknowledge that the name "Michael Kelly" is not a particularly unusual name and that a period of three years occurred between when the meeting was held and the guns were distributed and when Whiteside was indicted.  Whiteside argues that it would have been difficult to find Kelly.  But that, alone, is not sufficient to show that Whiteside was "unavoidably" prevented from obtaining evidence from Kelly within 120 days of the trial verdict, nor would it explain the delay of more than 30 years after the expiration of the 120-day deadline to seek leave to move for a new trial based on newly discovered evidence.  Whiteside asserts the common sense notion that finding someone with a common name is difficult, but Whiteside does not explain what "reasonable diligence" he or his counsel undertook to attempt to find Kelly, determine what he knew, and obtain Kelly's testimony if what Kelly knew was helpful to Whiteside's defense.  *Id.* at ¶ 10, quoting *State v. Walden*, 19 Ohio App.3d 141, 145-46 (1984).  In the absence of such a showing, it was not an abuse of discretion for the trial court to have refused to grant Whiteside leave to file a delayed motion for a new trial.

{¶ 20} We next address Whiteside's claim that one of the witnesses against him, Raymond, gave differing testimony in Gordon Newlin's trial that occurred after Whiteside's trial. Whiteside's trial occurred in early 1986. Newlin's trial occurred in early 1987. *Gordon Newlin*, 10th Dist. No. 87AP-222. Clearly, Whiteside could not have discovered the difference in testimony between the two trials within 120 days of the verdict in his trial because Raymond did not give testimony at Newlin's trial until approximately one year after Whiteside's trial.

{¶ 21} However:

> A " 'trial court may require a defendant to file his motion for leave to file within a reasonable time after he discovers the evidence.' " [*State v. Berry*, 10th Dist. No. 06AP-803, 2007-Ohio-2244,] ¶ 37, quoting *State v. Griffith*, 11th Dist. No. 2005-T-0038, 2006-Ohio-2935, ¶ 15. Indeed, in *Berry*, we explained that "[w]ithout some standard of reasonableness in filing a motion for leave to file a motion for new trial, a defendant could wait before filing his motion in the hope that witnesses would be unavailable or no longer remember the events clearly, if at all, or that evidence might disappear. The burden to the state to retry the case might be too great with the passage of time. A defendant may not bide his time in the hope of receiving a new trial at which most of the evidence against him is no longer available." *Id.* at ¶ 39, quoting *State v. Stansberry* (Oct. 9, 1997), 8th Dist. No. 71004.

*State v. Golden*, 10th Dist. No. 09AP-1004, 2010-Ohio-4438, ¶ 18. Whiteside makes no effort to explain why it has taken 30 years for him to discover the alleged differences in Raymond's testimony between his and Newlin's trials, a basis for his motion for leave to file a delayed motion for a new trial. The trial court did not abuse its discretion in finding that Whiteside failed to seek leave to file a motion for a new trial based on Crim.R. 33(B) within a reasonable time based on this allegedly new evidence.

{¶ 22} Whiteside's first and fourth assignments of error are overruled. In overruling both assignments, we note appellant's argument that the trial judge misquoted a part of Kelly's affidavit relating what Whiteside said to Kelly upon re-establishing contact. The affidavit reads:

> I saw Norman's family on the news at a Christmas Day protest in front of the parole board's main office. I located Norman's information in the computer and then wrote to him asking for contact information for Regina. I <u>included my telephone numbers. On New Year's Day 2014, Norman called me and</u>

said, "Do you know I've been trying to locate you for almost 30 years?"

(Emphasis added.)   (R. 216, Kelly Affidavit.)   The trial court's decision omitted the underlined language and therefore leaves the impression that Kelly told Norman he had been trying to locate him for 30 years.  While we agree this was error on the trial court's part, it appears to have been clerical and is harmless error, not affecting our overall analysis.

### B.  Second Assignment of Error – Whether the Trial Court Impermissibly Acted as a Court of Appeals

{¶ 23} Whiteside argues that the visiting judge who decided his motion was from an appellate court, and his frequent use of the word "we" when referring to the trial court indicated that he was not acting alone in deciding the cause and may have used a staff attorney or another judge to help prepare the decision.   (Whiteside's Brief, 15-17.) Whiteside concludes that the judge erroneously treated his motion as an appellate matter.

{¶ 24} However, staff attorneys are not solely native to the appellate realms.  Trial courts, both federal and state, can and do employ staff attorneys, judicial law clerks, and bailiffs to aid them in researching and writing decisions and orders.  The word "we" does not always connote a plurality of being.  The Oxford English Dictionary defines "we" in relevant part as, "[u]sed by a single person to denote himself or herself[;] [u]sed by a speaker or writer, in order to secure an impersonal style and tone, or to avoid the obtrusive repetition of 'I'."   Oxford English Dictionary (3d Ed.2008).   For example, *Sketches by Boz* remarked on the topic of the English criminal courts, "We shall never forget the mingled feelings of awe and respect with which we used to gaze on the exterior of Newgate in our schoolboy days."  Charles Dickens, *Sketches by Boz*, Chapter XXIV – Criminal Courts (1839).

{¶ 25} We (meaning it in the sense of the majority of this panel) find no evidence that the visiting judge was confused about his role or on which court he was sitting. Whiteside's second assignment of error is overruled.

### C.  Third Assignment of Error – Whether the Trial Court Ignored Evidence of Racism in Denying Whiteside's Motion for Leave

{¶ 26} Whiteside, in his brief, discusses defects in the evidence presented at trial and former prosecutor and now Judge Sheeran's apparent desire that Whiteside remain

in prison and not be paroled. Whiteside further concludes that these matters constitute evidence of racism. In effect, Whiteside argues that the zealous (and, in his view, overzealous) pursuit of punishment for those who had any hand in Carter's death is indicative of racism. We find no such evidence.

{¶ 27} The fact that Whiteside was convicted by white prosecutors before a white judge and a white jury for the death of a white victim does not establish that racism was a factor in his conviction. "To establish a prima facie violation of the fair-cross-section requirement, * * * a defendant must prove that: (1) a group qualifying as 'distinctive' (2) is not fairly and reasonably represented in jury venires, and (3) 'systematic exclusion' in the jury-selection process accounts for the underrepresentation." *Berghuis v. Smith*, 559 U.S. 314, 327 (2010), citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Whiteside makes no attempt to argue beyond simply that the racial makeup of the participants in his trial lacked diversity and that his imprisonment was racist. More compelling against his assertion is his admission of many of the salient facts that support his conviction by the jury. (*See, e.g.*, R. 216, Whiteside Affidavit, admitting that he was present at 111 ½ North 20th St. when the murder weapon was distributed; (Tr. 1035-38, 1047-50, 1082-84, 1110-11) (admitting he was present when the guns were purchased and distributed, that he felt he had to kill Thomas, and that he discussed ways of dealing with Thomas with the others).)

{¶ 28} Whiteside's third assignment of error is overruled.

## IV. CONCLUSION

{¶ 29} We overrule appellant's four assignments of error and affirm the decision of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT & HORTON, JJ., concur.

———————————