McDONALD, Justice (concurring in part and dissenting in part).
I concur in divisions IV.B (sufficiency of the evidence) and IV.C (ineffective assistance of counsel) of Justice Mansfield's opinion. I dissent from division IV.A of his opinion, which addresses Kenneth Lilly's fair-cross-section claim arising under the state constitution. For the reasons set forth below, I would affirm Lilly's conviction without remand. I thus respectfully concur in part and dissent in part.
I.
At issue is the right to an "impartial jury." Article I, section 10 of the Iowa Constitution provides, "In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right to a speedy and public trial by an impartial jury ...." Iowa Const. art. I, § 10. The majority concludes the state constitutional right to an impartial jury includes the right to a jury pool in which any "distinctive group" is not underrepresented by more than one standard deviation from the distinctive group's percentage of the jury-eligible population if the underrepresentation is due to systematic exclusion. I disagree.
A.
The constitutional right as constructed in the majority opinion is not on sound legal footing.
There is no textual or historical support for the proposition that the state constitutional right to an impartial jury includes the right to a jury pool drawn from a fair cross section of the community let alone the right to select a jury from a pool mathematically proportional to the jury-eligible population. Rather than conducting an independent inquiry into the meaning of our constitution, our cases have merely adopted the federal framework. But the federal framework is not supported by text or history. See Holland v. Illinois , 493 U.S. 474, 480, 110 S. Ct. 803, 807, 107 L.Ed.2d 905 (1990) ("The fair-cross-section venire requirement is obviously not explicit in th[e] text [of the Sixth Amendment] ...."); see also Berghuis v. Smith , 559 U.S. 314, 334, 130 S. Ct. 1382, 1396, 176 L.Ed.2d 249 (2010) (Thomas, J., concurring) ("[The right] seems difficult to square with the Sixth Amendment's text and history."); Duren v. Missouri , 439 U.S. 357, 371, 99 S. Ct. 664, 672, 58 L.Ed.2d 579 (1979) (Rehnquist, J., dissenting) ("The Constitution does not require, and our jurisprudence is ill served, by a hybrid doctrine such as that developed in Taylor , and in this case."); Taylor v. Louisiana , 419 U.S. 522, 539, 95 S. Ct. 692, 702, 42 L.Ed.2d 690 (1975) (Rehnquist, J., dissenting) ("Relying on carefully chosen quotations, [the majority] concludes that the 'unmistakable import' of our cases is that the fair-cross-section requirement 'is an essential component of the Sixth Amendment right to a jury trial.' I disagree. Fairly read, the only 'unmistakable import' of those cases is that due process and *315 equal protection prohibit jury-selection systems which are likely to result in biased or partial juries.").
Not only is the majority's interpretation atextual and ahistorical, it is also acontextual. The older Supreme Court cases upon which our precedents rely addressed widespread and state-sponsored or state-approved sexism and racism. In those cases, the systematic exclusion of large percentages of the population from civic life was stark, palpable, and easily observed. See, e.g. , Duren , 439 U.S. at 362-63, 99 S. Ct. at 667-68 (finding underrepresentation where 54% of the relevant community was women but only 15.5% served on weekly venires); Taylor , 419 U.S. at 524, 95 S. Ct. at 695 ("The appellee has stipulated that 53% of the persons eligible for jury service in these parishes were female, and that no more than 10% of the persons on the jury wheel in St. Tammany Parish were women."). That is not the case here. The older cases are different in kind, not in degree. The extraction of a mathematical proportionality principle from the older cases misses the larger context in which the cases were decided and elevates logic over experience. As former Supreme Court Justice Robert Jackson wrote,
The legal profession, like many another, tends to become over-professionalized. We forget that law is the rule for simple and untaught people to live by. We complicate and over-refine it as a weapon in legal combat until we take it off the ground where people live and into the thin atmosphere of sheer fiction.
Robert H. Jackson, The Struggle for Judicial Supremacy: A Study of a Crisis in American Power Politics 292 (1949).
Justice Jackson's constitutional fiction is demonstrated on the facts of this case. Here, the majority notes the African-American population for Lee County was 3% at the relevant time. Assume there was a jury pool of one hundred persons and three African-Americans were in the jury pool. In that case, the majority concedes that "[a] defendant whose jury pool has a percentage of the distinctive group at least as large as the percentage of that group in the jury-eligible population has not had his or her right to a fair cross section infringed." In other words, the claim fails as a matter of law. However, if only two African-Americans were in the same jury pool, under the majority's rule, the defendant would be entitled to significant discovery regarding the history of jury pools in the county. It seems wholly arbitrary to conclude the constitutional right to an impartial jury turns on whether a single additional member of a distinctive group out of one hundred potential jurors appears for jury service.
The constitutional text, the relevant history, and the context in which the relevant precedents were decided all militate against the majority's rule. In my view, to the extent we are going to go down this constitutional road, an appreciation of the prior evils our precedents sought to address counsels in favor of maintaining the absolute disparity test as a threshold test to differentiate cases presenting stark, palpable, and easily observed exclusion from cases that raise only questions about the limits of our analysis and the limits of our data.
B.
The defendant's proposed constitutional calculus suffers from another complication. While mathematical precision sounds promising in theory, it is problematic in practice. The constitutional calculus assumes the existence of reliable data that can be plugged into the legal equation. However, there is no such data. The lack of reliable data makes this constitutional endeavor largely guesswork.
*316 The record in this case demonstrates the unworkability of the rule in application. The majority cites no census data regarding the jury-eligible population in Lee County. The majority cites no census data regarding the African-American jury-eligible population in Lee County. Instead of relying on census data, the majority relies on the State's estimate that 75.83% of Iowans are eighteen years or older and the State's estimate that 65.4% of African-American Iowans are eighteen or older. The State's estimate is based on a dubious assumption regarding the flat distribution of the population across the relevant age ranges. The State's estimate is based on a further dubious assumption that state-level data regarding the age distribution for the population of Iowa as a whole is uniform from county to county. It is patently obvious the assumptions do not hold. In this particular case, the data is especially suspect. As the majority acknowledges, it is working with county-level data for Lee County. Unfortunately, Lee County is divided into two districts-North Lee County and South Lee County. There is no census information in the record regarding the jury-eligible population of North Lee County. The majority assumes an equal distribution of races between the two districts. There is no evidence of this. Quite simply, the defendant requests, and the majority adopts, a rule that requires proportionality to a largely indeterminate comparison population.
In addition to the problems inherent in determining the jury-eligible population in all cases, there is an additional problem in the data presented in this case. There is no record establishing the percentage of African-Americans in the jury pool. The record reflects 125 jury questionnaires were sent out, but there is no evidence in this record showing how many of those were returned. Of those returned, one juror identified herself as African-American, but many others did not identify any race. Without knowing the number of people in the pool and the races of the persons who failed to identify, it is simply guesswork to determine whether this particular pool was even underrepresentative.
It was the defendant's burden to establish a prima facie case, and he failed to do so. There is thus no reason to remand the case.
C.
The majority's rule is also impractical and burdensome. As former Chief Justice Rehnquist explained,
No one but a lawyer could think that this was a managerially sound solution to an important problem of judicial administration, and no one but a lawyer thoroughly steeped in the teachings of cases such as Taylor [v. Louisiana , 419 U.S. 522, 95 S. Ct. 692, 42 L.Ed.2d 690 (1975) ], [ Califano v. ] Goldfarb , [430 U.S. 199, 97 S. Ct. 1021, 51 L.Ed.2d 270 (1977) ], and Craig [v. Boren , 429 U.S. 190, 97 S. Ct. 451, 50 L.Ed.2d 397 (1976) ] could think that such a solution was mandated by the United States Constitution. No large group of people can be conscripted to serve on juries nationwide, any more than in armies, without the use of broad general classifications which may not fit in every case the purpose for which the classification was designed. The alternative is case-by-case treatment which entails administrative burdens out of all proportion to the end sought to be achieved.
The short of it is that the only winners in today's decision are those in the category of petitioner, now freed of his conviction of first-degree murder. They are freed not because of any demonstrable unfairness at any stage of their trials, but because of the Court's obsession *317 that criminal venires represent a "fair cross section" of the community, whatever that may be. The losers are the remaining members of that community-men and women seeking to do their duty as jurors and yet minimize the inconvenience that such service entails, judicial administrators striving to make the criminal justice system function, and the citizenry in general seeking the incarceration of those convicted of serious crimes after a fair trial.
Duren , 439 U.S. at 377-78, 99 S. Ct. at 675 (Rehnquist, J., dissenting).
The majority's new rule will create just as many problems as it hopes to solve. Of particular note, the majority's approach will increase the pressure to transfer venue of criminal cases with African-American defendants to urban counties to find more jury-eligible minorities. Such transfers burden already overcrowded city dockets and increase the inconvenience to the parties, victims, other witnesses, and community members who want to observe the trial. These out-of-district transfers also increase costs for the judicial branch by requiring additional travel for judges and court reporters. For the protection of the defendant, criminal cases should be tried in the county where the alleged crimes occurred, unless pretrial publicity requires a change in venue. See State v. Rimmer , 877 N.W.2d 652, 664-65 (Iowa 2016) (discussing history and purpose of the vicinage clause).
The problems identified by former Chief Justice Rehnquist will be particularly acute in our busier district courts. The jury managers in our more congested district courts will now be subject to discovery and subpoenaed to testify regarding jury management practices every time there is a small but immaterial variance in the racial composition of the jury pool.
Of course, administrative burden alone is not a sufficient ground to ignore a constitutional command. It is the judicial branch's obligation to interpret and apply the constitution to the facts of a particular case. It is also our special charge to continuously work to improve the administration of justice in this state. Where, as here, however, the constitutional rule is of dubious provenance and without any identifiable benefit to the fair and impartial administration of justice, the administrative burden is and should be a consideration when extending a rule that will have significant impact in the day-to-day operation of the courts.
D.
Finally, remand is not necessary because Lilly's claim fails as a matter of law.
First, the representation of the distinctive group in the jury pool (to the extent that can be determined) was fair and reasonable in relation to the number of such persons in the community. The census data shows approximately 34,000 people resided in Lee County during the relevant time. Of those, 3%, or approximately 1020 were African-American, meaning the non-African-American population was 32,980. Using the majority's estimates of eligible jurors (75.83% for all Iowans and 65.4% of African-American Iowans), there were approximately 25,008 non-African-American eligible jurors and 667 African-American eligible jurors. However, of those African-Americans eighteen years of age or older, approximately 300 were incarcerated at the Iowa State Penitentiary in Fort Madison. This is consistent with historical census information. See Rose Heyer & Peter Wagner, Too Big to Ignore: How Counting People in Prisons Distorted Census 2000 , Prison Policy Initiative (April 2004) [hereinafter Heyer & Wagner], https://www.prisonersofthecensus.org/toobig/datasearch.php?field=GEO_NAME
*318 & operator=LIKE & q=lee & Submit=Search & field1=Inc_Pop_Black & operator1= & q1= & sortby= & sortorder= [https://perma.cc/7DGC-CT3Y] (containing data set showing 27.67% of the African-American population in Lee County in 2000 was incarcerated). The parties agree the census counts prisoners in its census data and the prisoners should be excluded from determining the jury-eligible population. Removing incarcerated persons from the calculation, using the State's and majority's assumed statistics regarding the number of eligible jurors, shows the number of jury-eligible African-Americans in the county was actually only 367, or 1.4%. At least one of the jurors identified as African-American. In my opinion, when the jury-eligible population is adjusted for the incarcerated persons at Fort Madison, the jury pool here was "fair and reasonable in relation to the number of such persons in the community." Duren , 439 U.S. at 364, 99 S. Ct. at 668 (majority opinion). There is no reason for remand.
Second, I dissent from the majority's conclusion that run-of-the-mill jury management practices can support a systematic exclusion claim. That conclusion is in tension with Berghuis . A number of other jurisdictions have also concluded that run-of-the-mill jury management practices cannot support a showing of systematic exclusion. See State v. Sanderson , 182 Ariz. 534, 898 P.2d 483, 488 (Ct. App. 1995) ("Granting excuses based on the application of neutral criteria to prospective jurors' individual situations does not constitute systematic exclusion."); Douglas v. State , No. 2006-SC-000882-MR, 2007 WL 4462309, at *7 (Ky. Dec. 20, 2007) (finding defendant's showing that 48% of potential jurors did not respond to their summonses did not prove that the pool was not a fair cross section of the community); People v. Wallace , No. 237115, 2003 WL 1439812, at *7-8 (Mich. Ct. App. Mar. 20, 2003) (per curiam) (finding exemptions from jury summons based on age, citizenship, medical conditions, and inability to speak English did not violate the fair-cross-section requirement because "a defendant is not constitutionally entitled to a petit jury that precisely mirrors the makeup of the community"); State v. Murphy , No. A04-926, 2005 WL 1216635, at *2 (Minn. Ct. App. May 24, 2005) (finding that excusing eligible jurors from service because they lacked transportation did not result in a Sixth Amendment violation despite the fact the exclusion decreased the number of Native Americans in the jury pool); State v. Casillas , 145 N.M. 783, 205 P.3d 830, 837 (2009) (finding no systematic exclusion resulting from "the court clerk's practice of excusing jurors and the fact that Spanish-language jury summonses [were] not provided"); State v. Tremblay , No. P1 97-1816AB, 2003 WL 23018762, at *9 (R.I. Mar. 19, 2003) (finding no Sixth Amendment violation when jurors were excused because of financial hardship and medical reasons). I would follow these authorities rather than creating a new rule.
II.
Although I dissent from the majority's resolution of the constitutional claim, I do not dissent from the conclusion that the administration of justice is enhanced by greater civic participation from all members of our Iowa community. On this, everyone agrees. The other branches of the government have already enacted legislation to that effect. See Iowa Code § 607A.1 (2017) ("It is the policy of this state that all persons be selected at random from a fair cross section of the population of the area served by the court, and that a person shall have both the opportunity in accordance with the provisions of law to be considered for jury service in this state *319 and the obligation to serve as a juror when selected."). In my experience, our state court administration, district court judges, district court clerks, and jury managers have acted in good faith to implement the statutory command for full civic participation in jury service. Justice Wiggins recently chaired a commission tasked with identifying ways to increase minority representation in jury pools. Such efforts can and should continue. Ultimately, however, there is a legal distinction between constitutional command and best practices; the constitution does not require we micromanage the significant advances already made in jury representation and those yet to come.
For these reasons, and for the reasons stated in my separate opinion in State v. Veal , 930 N.W.2d 319, 363 (McDonald, J., concurring in part and dissenting in part) (Iowa 2019), I respectfully concur in part and dissent in part.
Waterman and Christensen, JJ., join this concurrence in part and dissent in part.