# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE

Assigned on Briefs September 13, 2022

## STATE OF TENNESSEE v. KEITHANDRE TREVON MURRAY

**Appeal from the Circuit Court for Macon County**
**No. 2017-CR-173     Brody Kane, Judge**

___

### No. M2021-00688-CCA-R3-CD

___

The defendant, Keithandre Trevon Murray, appeals his Macon County Circuit Court jury convictions of first degree murder, challenging the sufficiency of the evidence, the admission of Facebook messages, the absence of African Americans in the jury pool, the admission of certain testimony, and the imposition of consecutive sentences. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and KYLE A. HIXSON, JJ., joined.

Jamie Tarkington, Hendersonville, Tennessee (on appeal); and William Cather, Lebanon, Tennessee (at trial), for the appellant, Keithandre Trevon Murray.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan Wardle, Assistant Attorney General; Tommy Thompson, District Attorney General; and Jason Lawson and Javin Cripps, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Macon County Grand Jury charged the defendant with two counts of first degree premeditated murder for the deaths of James Turner and Alisha Mondoni on February 11, 2017.[1]

___

[1] A superseding indictment added two counts of first degree felony murder and two counts of attempted aggravated robbery related to the events that culminated in the deaths of Mr. Turner and Ms. Mondoni, but the State dismissed those charges prior to trial and elected to proceed only on the premeditated murder charges.

The offenses in this case began with the theft of a Play Station IV gaming system from the home of Mr. Turner.  At the time of the offenses, Mr. Turner lived at least some of the time in a residence on New Harmony Road in Macon County that he had previously shared with a woman named Logan Riley.  Mr. Turner's son, Michael Turner, who was known as "Scooter," also lived in the residence.[2]  Ms. Riley's children, Kenyan Harper and Kelsey Harper, also lived in the residence until shortly after Ms. Riley was killed in a car accident in November 2016.  The defendant, who was Kelsey Harper's boyfriend, spent a significant amount of time at the residence, as did Mr. Turner's nephew, Stephen Turner, Jr., who was known as "Chicago."   In February 2017, Chicago owed Kenyan Harper $1,000 for gambling debts related to bets he had placed during video gaming sessions and for marijuana he had obtained from Mr. Harper.  Mr. Harper, who was planning to turn himself in on an outstanding probation violation warrant, asked Chicago for the money, and Chicago told Mr. Harper that he would give the money to Ms. Harper.  Mr. Harper did not trust Chicago to do as he said, so Mr. Harper went to the New Harmony Road residence and took from the room shared by Scooter and Chicago a Play Station IV gaming system, some games, and some controllers.  He dropped the items off at Ms. Harper's apartment in Hartsville and then turned himself in at the jail in Hartsville.

After Chicago discovered the theft, he tried to find the culprit.  On February 9, 2017, the defendant suggested that Drey Jackson, a mutual friend, had taken the gaming system.  Chicago investigated this lead and, after speaking to Mr. Jackson, was satisfied that Mr. Jackson had not committed the theft.  Later that same evening, the defendant confronted Chicago and Scooter at Mr. Jackson's grandmother's home, took Chicago's bag at gunpoint, backed out of the house, and fired a shot into the air as he left.  This began "a feud" between Chicago and the defendant.

On February 10, 2017, Chicago and the defendant "exchanged words" over social media that became increasingly more threatening.  At some point, Chicago drove by Ms. Harper's apartment and saw the defendant standing outside with Ms. Harper's daughter.  He then told the defendant that the presence of Ms. Harper's daughter was the only thing that saved him from violent reprisal for pointing a gun at Chicago.  The defendant responded by telling Chicago that none of Chicago's family members or friends were "off limits" from the violence he intended to inflict as part of the feud.  The two men eventually agreed to meet in person in Lebanon to settle the dispute.  In a later message, Chicago told the defendant that he knew that the defendant had not gone to Lebanon as arranged but had remained at Ms. Harper's residence, warning the defendant that if anything happened to Ms. Harper or her "baby that blood on yo hands.  Everybody I'm f****** with know it's no lacking.  I got all these locations.  Mother f****** fixing to be

---

[2] Because many of the individuals involved have the same surname and because many of the witnesses refer to one another primarily by nickname, we will use nicknames for the sake of clarity.

mad at what's coming next." Chicago also warned Ms. Harper via text message to either make the defendant leave her apartment or leave with her daughter to avoid the impending violence. Chicago prepared for "a fight" that "was going to be bigger than just using hands" and that would "[p]robably . . . be a shootout."

Chicago and the defendant later spoke by telephone, and the defendant told Chicago that he was behind the Lowe's store. When Chicago went to that location, he did not see the defendant. He then drove to the Walmart next door, where he encountered Tyresha Burnley, whose mother, Heather Locke, was dating Mr. Turner and to whom Chicago referred as his "sister." Ms. Burnley told Chicago that the defendant had told her via Snapchat video message "that he knew where my momma and James and Chicago lived" and "that I'm gonna kill y'all or I'm going to shoot up the house." Chicago drove back to Hartsville, passing Ms. Harper's apartment shortly before 8:00 p.m. In the apartment complex parking lot, a truck pulled behind him and "[s]omebody come by shooting." Chicago drove his car into a field at the end of the street, exited through the passenger's side door, and crouched behind the car with his own gun. He exchanged shots with the unknown assailant. Several bullets struck Chicago's BMW. The truck pulled away, and Chicago went to a friend's house. After the murders in this case and believing the shootout at the apartment might be connected to the murders, Trousdale County authorities investigating the shooting at the apartment complex contacted the Tennessee Bureau of Investigation ("TBI"). Trousdale authorities, in conjunction with the TBI, collected shell casings from the parking lot and the adjacent field and searched Ms. Harper's apartment.

At some point at the defendant's request, Ms. Harper contacted her friend, Brittney Calhoun, and got the telephone number of Ms. Calhoun's boyfriend, co-defendant Rodney Garrett. After the two men spoke by telephone, Ms. Harper and the defendant met the co-defendant at a Days Inn. The defendant left with the co-defendant while Ms. Harper went to pick up Ms. Calhoun. Sometime after 7:00 p.m. on February 10, 2017, Ms. Harper took Ms. Calhoun to meet the defendant and co-defendant. The two men "were both just rushing," and the co-defendant revealed "that [the defendant] had got to shooting" before they met with the women. The defendant got into Ms. Harper's car, and Ms. Calhoun got into the car with the co-defendant. Ms. Calhoun and the co-defendant drove to the apartment of a friend of the co-defendant's in Nashville, where they switched from the co-defendant's car to a "bluish SUV" owned by the co-defendant's friend "because whenever he said that [the defendant] had got to shooting in his car, he did not feel comfortable driving his car." Ms. Harper and the defendant went to Ms. Harper's apartment and then to Ms. Harper's father's house. While there, the defendant and Chicago continued to go "back and forth with the messages," and, when a friend of Chicago's sent the defendant a picture of the defendant's daughter, the defendant "seemed to get very angry."

While the feud between the defendant and Chicago raged, Mr. Turner and Ms. Locke were doing laundry. When the couple ran out of quarters some time between 10:30 and 11:00 p.m., Mr. Turner asked Ms. Mondoni, a neighbor, to drive him to get more quarters because his car was not working. After he left, "[t]he kids called" Ms. Locke "and told us that they started with my daughter at Walmart and they started with my nephew and my step son at the Outlet Mall." Ms. Locke alerted Mr. Turner that "they're starting something over in Lebanon." When Mr. Turner did not return that evening, Ms. Locke assumed he had stayed at his New Harmony Road residence.

Ms. Calhoun and the co-defendant met Ms. Harper and the defendant at Ms. Harper's father's residence, and, after midnight, the two couples got into the bluish SUV and drove toward the New Harmony Road residence, where they believed they would find Chicago and Scooter. Referring to Chicago, the defendant said, "If I can't get him, I'm going to get someone close to him." The co-defendant was armed with a "long gun" that "looked like a BB gun,"[3] and the defendant was armed with "a small gun." Ms. Calhoun parked the vehicle in "a gravel area on the side of the road" across from a church near but out of sight of the New Harmony Road residence. The men approached the house on foot "along the bushes, trying to like blend in with them to keep the cars from seeing them." After a short time, Ms. Harper heard Mr. Turner say, "[Y]ou've been messing with my son." Gunshots followed. When the shooting stopped, the defendant and co-defendant ran back to the car. When asked what happened, the defendant told Ms. Harper, "I think that I killed him." He also said, "[A]ll I can say is, rest in peace." The foursome drove back to Ms. Harper's father's house, and the defendant went inside with Ms. Harper. The co-defendant and Ms. Calhoun left.

Neighbor Sharon Hilderbran found Mr. Turner lying "in the gravel" in his driveway and observed "red right where his belly line was." Mr. Turner asked her to "get the neighbor, 911." She alerted Mr. Turner's next door neighbor, Dayton Matthews, who telephoned 9-1-1 and then "grabbed some towels" to "try[] to keep him from bleeding out" in "the middle of the driveway." Mr. Turner "rock[ed] back and forth," in obvious pain, and tried to urinate. Mr. Turner told Mr. Matthews, "[M]y friend is here." Mr. Matthews walked to the car and observed "a young woman" inside the car who had "been shot to death." Mr. Matthews' wife then telephoned 9-1-1 again. Unfortunately, aid did not arrive until some 30 minutes later, and Mr. Turner succumbed to his injuries. TBI agents collected both victims' cellular telephones, several bullet fragments, and several shell casings. Ms. Mondoni's car was towed for forensic testing.

---

[3] Ms. Calhoun described this weapon as an airsoft gun, and a number of airsoft guns, both rifle and handgun style, were later recovered from the co-defendant's residence.

Chicago and Scooter drove down New Harmony Road just as the police were arriving on the scene. They spoke to officers at the scene but did not mention the defendant's name. Chicago candidly admitted that he did not initially mention the defendant as a suspect because "[f]or honesty, I was going to kill him." He eventually told the TBI about his feud with the defendant, including the shoot out in the parking lot of Ms. Harper's apartment, and allowed the TBI to conduct forensic testing on his car.

After they saw news coverage of the murders, the defendant asked Ms. Harper "to get rid of his gun," said "that he needed to go and get rid of" the gun, and told her "that he needed to get out of Hartsville." At the defendant's request, Ms. Harper dropped the defendant off at a friend's house in Lebanon; he still had the gun with him. A search of Ms. Harper's apartment yielded an unspent 9-millimeter bullet inside a bedroom closet and an unspent 9-millimeter bullet "right outside of the apartment in the gravel there as you walk down the steps."

An autopsy established that Mr. Turner died as a result of multiple gunshot wounds. One bullet entered the left side of his abdomen, traveled into his belly, and exited "[o]n the right side of the torso . . . almost [at] his right hip." Two bullets entered "very close to each other and the wound paths run right alongside each other;" one exited the body just to the left of the midline of the back and the other was recovered from the pelvis during the autopsy. A fourth bullet entered the right side of the back and exited to the left side of the right back. A fifth bullet entered and exited "the glands or head of the penis." A sixth bullet entered the inside of the right thigh and traveled "through the soft tissue of the thigh, the fat and fibrous tissue and the muscle" before the bullet "actually broke the right femur"; that bullet was recovered from his right thigh.

An autopsy established that Ms. Mondoni also died as a result of multiple gunshot wounds. One bullet grazed "along the back of her neck," causing "bleeding on her spinal cord." A second bullet entered her neck and traveled "through the soft tissue and skin of that right side of the upper back and torso," broke two ribs, caused "bleeding on the top of the spinal cord along the back of the neck," exited her body, and struck the right arm, causing bruising and abrasion to the arm. A third bullet entered the left side of the abdomen and "injured several of the abdominal organs including the stomach, the duodenum, . . . and the pancreas" before becoming lodged "on the right side of the back just like under the skin." A fourth bullet entered "the left side of the torso" and injured "the left iliac bones" and the lumbar spine, causing spinal bleeding, and then entered the soft tissue of the abdomen. A fifth bullet entered the right side of the torso, injuring the right kidney, the colon, and the left iliac bone, before exiting the left side of the torso. Bullets also entered the front of the right forearm, broke the ulna, and exited the back of the right forearm and entered the back of the arm, broke the humerus, and exited on the front of the forearm.

-5-

Forensic testing established that the spent 9-millimeter shell casings recovered from the murder scene had been fired from the same gun that fired the spent 9-millimeter shell casings recovered from the parking lot of the apartment complex where Ms. Harper lived. The bullets recovered from Mr. Turner's body, Ms. Mondoni's body, Ms. Mondoni's car, and Chicago's car had all also been fired from the same 9-millimeter weapon. The shots fired at the victims had all come from the driver's side of the car. A .45-caliber spent shell casing recovered from the field adjacent to the apartment complex parking lot did not match the two .45-caliber spent shell casings recovered from the murder scene; testimony established that people often shot handguns at the New Harmony Road residence.

The defendant's name was placed on the TBI's Ten Most Wanted list after efforts to locate him proved fruitless. Using geolocation technology, the TBI located the defendant's cellular telephone in Monroe, Louisiana. TBI Agents traveled to Louisiana and, working with local authorities, looked for the defendant at residences belonging to an uncle and two of the defendant's sisters. Eventually, the defendant's mother arranged for the defendant's grandfather, a retired sheriff's deputy, to facilitate the defendant's turning himself in on February 22, 2017.

Based upon this evidence, the jury convicted the defendant as charged of the first degree murders of Mr. Turner and Ms. Mondoni. The trial court imposed a sentence of life imprisonment for each conviction and, following a sentencing hearing, aligned the sentences consecutively based upon its finding that the defendant was a dangerous offender.

*I. Sufficiency*

The defendant challenges the sufficiency of the convicting evidence, arguing that Chicago, Ms. Harper, and Ms. Calhoun "were unreliable in that they had a motive to testify falsely." He also argues that the Facebook messages should have been excluded and that, had they been excluded, the remaining evidence would have been insufficient to support his convictions.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the trier-of-fact resolves any questions concerning the

-6-

credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As relevant here, "[f]irst degree murder is . . .[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1), (2). Premeditation is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). "The existence of premeditation is a question of fact to be determined by considering all of the evidence." *State v. Reynolds*, 635 S.W.3d 893, 916 (Tenn. 2021) (citing *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017); *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013)). Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007); *see also Reynolds*, 635 S.W.3d at 916 ("Because premeditation involves the defendant's state of mind, of which there is often no direct evidence, we have 'long recognized that premeditation may be proved by circumstantial evidence,' and 'may be inferred from the manner and circumstances of the killing.'" (citations omitted)). Thus, when evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has enumerated a number of circumstances that inform our evaluation of the existence of premeditation:

(1) The use of a deadly weapon on an unarmed victim;
(2) The particular cruelty of the killing;
(3) Threats or declarations of intent to kill;
(4) The procurement of a weapon;

(5) Any preparations to conceal the crime undertaken before the crime was committed;
(6) The destruction or secretion of evidence of the killing;
(7) Calmness after the killing;
(8) Evidence of motive;
(9) The use of multiple weapons in succession;
(10) The infliction of multiple wounds or repeated blows;
(11) Evidence that the victim was retreating or attempting to escape when killed;
(12) The lack of provocation on the part of the victim; and
(13) The failure to render aid to the victim.

*Reynolds*, 635 S.W.3d at 916-17 (citations omitted).

We must decline the defendant's invitation to reevaluate the credibility of the witnesses or to revisit inconsistencies in the testimony because both fall solely within the purview of the jury as the trier of fact. *See Cabbage*, 571 S.W.2d at 835. Additionally, even if we concluded that the Facebook messages should not have been admitted, they were admitted at trial, and their inclusion into the sufficiency of the evidence calculus is not affected by whether this evidence should have been inadmissible. *See State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981) (holding that even inadmissible evidence goes into a calculation of the sufficiency of the evidence). The evidence adduced at trial established that a feud between Chicago and the defendant that began as a dispute over a stolen gaming system precipitated the defendant's going to the New Harmony Road residence and shooting Mr. Turner and Ms. Mondoni, neither of whom had any involvement in the argument. What began as a war of words escalated until the defendant warned Chicago that no one in his family was safe from the violence about to erupt. Chicago and the defendant engaged in a violent shootout in the parking lot of Ms. Harper's apartment complex. After the shootout, the defendant and co-defendant solicited Ms. Calhoun to drive them to a location near the New Harmony Road residence under the cover of darkness. The co-defendant had procured a car other than his own to use for this drive. Ms. Calhoun was directed to park out of sight of the residence, and the two men then approached the residence by stealth on foot, taking special care not to be seen by passing motorists. Both victims, neither of whom was armed, were shot multiple times. Mr. Turner was shot in his genital area. Ms. Mondoni died on the scene, and Mr. Turner crawled down the driveway, bleeding and moaning in agony from his injuries. The defendant and co-defendant fled the scene. The defendant admitted that he thought he had killed Mr. Turner and asked Ms. Harper to help him hide his gun before he ultimately disappeared, only to be found after an extensive search that ended in Monroe, Louisiana. All of the spent 9-millimeter casings and bullets recovered in this case both from the apartment complex and the murder scene had been fired by a single weapon. This evidence is more than sufficient

to support the defendant's convictions of the premeditated murders of Mr. Turner and Ms. Mondoni.

## II. Facebook Messages

The defendant next asserts that the trial court erred by admitting into evidence the Facebook messages exchanged by the defendant and Chicago, arguing that the State failed to properly authenticate the messages by failing to present sufficient evidence that the messages were actually sent by the defendant. The State contends that the trial court did not err.

Prior to trial, the State moved the trial court to determine whether the Facebook messages exchanged by the defendant and Chicago would be admissible. The State alleged that it had been unable to contact Chicago to serve him with a subpoena to secure his attendance and that, as a result, the State wanted to introduce the messages via the testimony of "the TBI agent who obtained a search warrant for the records and who received the response from the Facebook company." At the hearing on the State's motion on the first day of trial, the State indicated that it anticipated that Chicago would testify at trial and that he would authenticate the messages. The defendant argued that the probative value of the "Facebook nonsense" was outweighed by the potential for unfair prejudice. Ultimately, the trial court ruled that, so long as Chicago testified and could authenticate the messages, the messages were admissible. The court concluded that the messages were relevant and that their probative value substantially outweighed the danger of unfair prejudice.

During the trial, the State indicated that it had "receive[d] a custodial affidavit from Facebook regarding records and that they had looked back and verified and that it was in fact a true and accurate copy of the records." Defense counsel indicated that he had "reviewed it and it appears to comply with the requirements." Later, Chicago identified the messages as those he had exchanged with the defendant via a Facebook profile he knew belonged to the defendant. He said that the messages were the same messages he exchanged with the defendant in the lead-up to the murders.

Tennessee Rule of Evidence 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). One method of authentication is testimony by a witness with knowledge "that a matter is what it is claimed to be." Tenn. R. Evid. 901(b)(1). Both Rule 901 and the common law designate the trial court as the "arbiter of authentication issues," and, accordingly, that court's ruling will not be disturbed absent a showing that the court clearly abused its discretion. *See* Tenn. R.

-9-

Evid. 901, Advisory Comm'n Comments; *State v. Mickens*, 123 S.W.3d 355, 376 (Tenn. Crim. App. 2003).  An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006), *overruled on other grounds by State v. Patterson*, 564 S.W.3d 423, 433 (Tenn. 2018); *see State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

The record establishes that the defendant abandoned his objection to the authenticity of the messages after learning that Chicago would testify at trial.  He complained about their relevance and their probative value but acquiesced to their authenticity at that point.  He raised the issue again in his motion for new trial, asserting that the State had failed to conclusively establish that the defendant had authored the messages attributed to him.  That no witness could say with certainty that the defendant had sent the messages attributed to him was irrelevant to the determination whether the messages were properly authenticated under Rule 901; it was enough that Chicago testified that the messages admitted at trial were what they purported to be.  *See, e.g.*, *State v. Thomas*, No. E2017-02378-CCA-R3-CD, 2019 WL 1224581, at *3 (Tenn. Crim. App., Knoxville, Mar. 15, 2019).  Accordingly, the trial court did not err.

## III.  Fair Cross Section

The defendant contends that the trial court should have, sua sponte, declared a mistrial when it became apparent that the jury pool contained no African Americans.  The State argues that the defendant waived plenary consideration of the failure to grant a mistrial by failing to request a mistrial when he brought the issue to the court's attention.

Near the beginning of voir dire, defense counsel observed, "We have 84 jurors and there's not any African Americans."  The court replied, "We called seven panels, which is every panel that was selected."  The court also noted that "Macon County has a traditionally low minority population."  The court then asked the defendant if he had "a *Batson* objection," and the defendant replied that he did.[4]  The State argued that the defendant could not mount "a sustainable challenge" unless he could "actually show an intentional systematic exclusion of the racial composition of the jury."  The court stated

---

[4]Although the parties and the trial court deemed the defendant's complaint a *Batson* challenge, a *Batson* challenge actually refers to a challenge to the "purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges." *Batson v. Kentucky*, 476 U.S. 79, 96 (1986).  Under *Batson*, once a prima facie case of discrimination has been shown by a defendant, the State must provide race-neutral reasons for its peremptory strikes.  "The trial judge must consider the State's proffered reasons "in light of all of the relevant facts and circumstances, and in light of the arguments of the parties," *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019), and "determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination," *id.* at 2241 (citation omitted).

that it would "note the defense's objection for the record" and observed that "just based on my review, there are no African Americans in here but I don't know what the population make up is for Macon County, but it is what it is." The court offered to allow the defendant to question the court clerk during the break in voir dire. The defendant agreed, and voir dire continued.

During the next recess, the defendant called the court clerk, Rick Gann. Mr. Gann testified that he was aware that no African Americans had arrived for jury duty from among any of the seven panels called by the clerk's office. Mr. Gann said that Macon County utilized a jury selection system that relied on records from the Tennessee Department of Safety. He said that although he was "no expert," he would estimate the African American population of Macon County to be "less than two percent." Mr. Gann testified that there had been no jury trials in Macon County in 2019 until the defendant's in April and that the last jury trial had occurred in 2017. Mr. Gann said that during the entirety of his 13-year tenure as clerk, only one African American had reported for jury duty, saying, "I know him that's why I remembered that." Mr. Gann said that his office had not tried to alter its selection method to increase the number of African Americans called for jury duty and added that his office did not "have any control over" the system that randomly drew from names "uploaded from the Department of Safety."

During cross-examination by the State, Mr. Gann testified that the selection system was "a push of a button on our local government system which pulls from a specific pool of driver's licenses that we have" and that his office did not have the "option" to filter names so as to exclude any person or group. He said that, once the list was populated, potential jurors were sent questionairres and that the questionairres did not include questions about race. No further discussion occurred on the issue until after the jury was seated and after some proof had been presented in the case. The State asked the court "to put on the record that" one of the petit jurors "does appear to be of Asian descent" and that "he was the only minority who was in the jury pool, but he did make make the jury."

The defendant argued in his motion for new trial that the trial court erred by "denying defendant's oral Motion to Dismiss Jury Venire" because "the method of selecting persons to be summoned for jury duty violates the right of the defendant, an African American, to be tried by a jury of his peers." The transcript of the hearing on the motion for new trial was not included in the record on appeal, and the trial court's order denying the motion for new trial states only that it was denied "for reasons stated on the record from the bench."

As an initial matter, we observe that the defendant did not ask for a mistrial and, indeed, did not mention the issue again until his motion for new trial. Because he did not move for a mistrial, he has waived plenary review of this issue. *See State v. Bristol*,

No. M2019-00531-SC-R11-CD, 2022 WL 5295777, at *4, ___ S.W.3d ___ (Tenn. 2022) (reiterating that "[i]t has long been the general rule that questions not raised in the trial court will not be entertained on appeal" (alteration in original) (quoting *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983) (other citations omitted))).  His claim on appeal that the court should have, sua sponte, declared a mistrial, is also waived, having been presented for the first time on appeal.  *Id.*

Waiver notwithstanding, the defendant cannot establish entitlement to relief via review for plain error because he failed to establish a Sixth Amendment violation.  This court will grant relief for plain error only when:

> (1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)).  The party claiming plain error bears the burden of satisfying all five criteria as a prerequisite to plain error review.  *See id.*  Because each factor must be established, we need not consider all five factors when a single factor indicates that relief is not warranted.  *State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014) (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)).

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (citing *Taylor v. Louisiana*, 419 U.S. 522 (1975)).  "[T]o establish a prima facie violation of the Sixth Amendment's fair-cross-section requirement," the defendant

> must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."

-12-

*Berghuis*, 559 U.S. at 319 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).  As the Court observed, "[t]he first showing is, in most cases, easily made; the second and third are more likely to generate controversy."  *Berghuis*, 559 U.S. at 319.  The Court has not "specifie[d] the method or test courts must use to measure the representation of distinctive groups in jury pools" but has identified three "imperfect" methods either "employed or identified in lower federal court decisions: absolute disparity, comparative disparity, and standard deviation."  *Id.* at 329 (citation omitted).  "Absolute disparity" is calculated by subtracting the percentage of members of the allegedly excluded group in the jury pool from the percentage of members of the same group "in the local, jury-eligible population."  "Comparative disparity" is calculated "by dividing the absolute disparity . . . by the group's representation in the jury-eligible population."  *Id.* at 323.  "Standard deviation analysis seeks to determine the probability that the disparity between a group's jury-eligible population and the group's percentage in the qualified jury pool is attributable to random chance."  *Id.* at 324 n.1.  Our supreme court found "much to agree with in the approach adopted by the Michigan Supreme Court and referenced in *Berghuis*" and adopted the same "case-by-case approach" utilized by the Michigan Supreme Court: "Provided that the parties proffer sufficient evidence, courts should consider the results of all the tests in determining whether representation was fair and reasonable."  *State v. Hester*, 324 S.W.3d 1, 43 (Tenn. 2010) (quoting *People v. Smith*, 615 N.W.2d 1, 3 (Mich. 2000)).

The defendant in this case failed to establish a prima facie violation of the fair cross-section requirement and, consequently, has failed to establish that a clear and unequivocal rule of law was breached, that the alleged error adversely affected any of his substantial rights, or that any alleged error was so significant as to have affected the outcome of the trial.  To be sure, African Americans are a distinctive group in the community.  The defendant failed, however, to present any evidence that the representation of African Americans in venires from which juries were selected in Macon County was not "fair and reasonable in relation to the number of such persons in the community" and certainly did not establish that any "underrepresentation is due to systematic exclusion of the group in the jury-selection process."  Indeed, the only evidence offered by the defendant on the issue, the testimony of Mr. Gann, supported a conclusion that the lack of African Americans in the venire was likely attributable to the relatively low African American population in Macon County.  The defendant is not entitled to relief on this issue.

## IV.  Testimony of Hunter Greene

The defendant next asserts that the trial court erred by permitting "TBI Agent Greene to testify to the results of latent print examiner Elizabeth Reid" in violation of his constitutional right to confront the witnesses against him.  The State argues that the defendant waived appellate review of his Confrontation Clause challenge by failing to make a constitutional claim at trial.

On the fourth day of trial, the State informed the court that TBI Agent Elizabeth Reid, the latent fingerprint examiner who performed the fingerprint examinations in this case, was ill and "unable to travel this week." The State indicated that it was going to substitute her testimony with the testimony of another TBI latent print examiner, Hunter Greene, noting that Agent Greene had reviewed Agent Reid's file in the case. The defendant objected, stating specifically that "[o]ne of the issues here is . . . were there areas of the vehicle that in hindsight should have been dusted but weren't. And I don't know if an alternate agent can provide testimony about that." The trial court overrruled the objection, concluding that that line of questioning "would go to the weight" of the evidence rather than its admissibility. The defendant made no further objection and did not object to Agent Greene's being deemed an expert in latent fingerprint examination.

Agent Greene testified that she performed the technical review of Agent Reid's work in this case, explaining that when a fingerprint examiner finished working a case, their work was submitted for technical review "to make sure no mistakes were made and that the conclusions drawn are within the scope of what they performed." In this case, Agent Reid reviewed the evidence, and "[w]hen she was completed with her examinations it was turned over to me and I reviewed it to make sure it was technically correct." Agent Greene testified that the TBI was asked to process the exterior of the vehicle in which Ms. Mondoni was found for fingerprints and that, in doing so, Agent Reid found only two identifiable prints, one of which belonged to Mr. Turner and one of which belonged to a member of the Macon County Sheriff's Department. During cross-examination, Agent Greene said that Agent Reid's file did not indicate that she had dusted the driver's side window sill of the vehicle.

We agree with the State that the defendant waived his Confrontation Clause challenge to Agent Greene's testimony by failing to make a constitutional challenge at trial. The defendant's objection to Agent Greene's testimony was not based in the constitution but was instead based on his desire to ask questions about the areas of the vehicle that were dusted for fingerprints. *See Bristol*, 2022 WL 5295777, at *4. Additionally, he cannot establish entitlement to relief via plain error review because he cannot establish that a clear and unequivocal rule of law was breached. In an analogous situation, our supreme court has held that an autopsy report may be properly admitted through an appropriate expert witness other than the doctor who performed the autopsy. *See State v. Hutchison*, 482 S.W.3d 893, 914-15 (Tenn. 2016). Moreover, neither Agent Greene's testimony nor Ms. Reid's report linked the defendant, or any other person for that matter, to the shootings. The defendant was able to question Agent Greene about the failure to dust for prints on the driver's side window sill, but nothing in the record suggests that the person who shot the victims would have necessarily touched that area during the shooting. Consequently, even if the court had erred by admitting the report and the testimony, the error would have been

harmless beyond a reasonable doubt, *see Coy v. Iowa*, 487 U.S. 1012, 1021 (1988) ("We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis and see no reason why denial of face-to-face confrontation should not be treated the same." (citation omitted)), and, accordingly, the defendant cannot establish that any alleged error substantially affected his substantial rights.

## *V. Sentencing*

In his final claim for relief, the defendant, citing an out-of-date version of the Code and an inapplicable standard of review, asserts that the imposition of consecutive life sentences "was excessive." The State contends that consecutive sentences were appropriate.

Because the State did not seek either a sentence of death or a sentence of life without the possibility of parole, the only statutorily available sentence for the defendant's murder convictions was life imprisonment. In determining that the defendant's life sentences should be served consecutively, the trial court found that the defendant was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." The court noted that neither victim had anything to do with the feud between the defendant and Chicago and that Ms. Mondoni, in particular, "was just in the car at the wrong time, at the wrong place." The court described the murders as "an execution style killing, two people, each shot six times. Mr. Turner was actually shot through his genitals." The court found that "consecutive sentencing is necessary," finding that "it would serve the public's interest to protect the public from any further criminal conduct by this particular [d]efendant and by those who may consider this in the future." The court ultimately concluded that the aggregate sentence was "congruent with the general principles of sentencing" and "necessary given the circumstances."

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the

sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). In *State v. Wilkerson*, the supreme court held that the trial court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct before utilizing the "dangerous offender" category to impose consecutive sentencing, *see State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995), and "[t]he adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement," *Pollard*, 432 S.W.3d at 863.

In our view, the trial court did not abuse its discretion. The defendant does not argue that the trial court misapplied the enhancement or mitigating factors and does not contend that the trial court failed to comply with *Wilkerson*. Instead he asks this court to modify the sentence because consecutive life sentences are equivalent to a sentence of life without parole. We must decline the defendant's invitation because our Code does not prohibit the imposition of consecutive life sentences. So long as the trial court complies with the purposes and principles of sentencing when imposing a within-range sentence and provides reasons on the record supporting a finding of at least one of the grounds in Code section 40-35-115(b), it is free to impose consecutive life sentences. The trial court did so in this case, and its sentencing decision was fully supported by the record.

*Conclusion*

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., PRESIDING JUDGE